**Opinions of the United States Court of Appeals for the Third Circuit**



2-14-2005

# Willow Inn Inc v. Pub Ser Mutl Ins Co

Precedential or Non-Precedential: Precedential

Docket No. 03-2837

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Willow Inn Inc v. Pub Ser Mutl Ins Co" (2005). *2005 Decisions.* Paper 1506.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1506

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Case No:  03-2837
_____

WILLOW INN, INC., a Pennsylvania Corporation,


v.


PUBLIC SERVICE MUTUAL INSURANCE COMPANY,
a New York Corporation,
Appellant


_____


On Appeal From The United States District Court
For The Eastern District Of Pennsylvania
(Civ. No. 00–5481)
District Judge: The Honorable Berle M. Schiller


_____


Argued November 16, 2004
_____


Before: ROTH, SMITH, and WEIS, *Circuit Judges*

(Filed: February 14, 2005)

Louis J. Brown, Esq.
Edward M. Koch, Esq. (argued)
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395

*Counsel for Appellant.*

Howard G. Silverman, Esq. (Argued)
Kane & Silverman, P.C.
2401 Pennsylvania Avenue, Suite 1C-44
Philadelphia, PA 19130

*Counsel for Appellee.*

Robin S. Conrad, Esq.
National Chamber Litigation Center
1615 H. Street, N.W.
Washington, DC 20062

Carter G. Phillips, Esq.
Eric A Shumsky, Esq.
Sidley Austin Brown & Wood LLP
1501 K Street, N.W.
Washington, DC 20005

*Counsel for Chamber of Commerce of the United States –
Amicus Curiae in Support of Appellants.*

Amy Bach, Esq.
United Policyholders
42 Miller Avenue
Mill Valley, CA 94941

Timothy P. Law, Esq.
Anderson Kill & Ollick, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103

*Counsel for United Policyholders – Amicus Curiae in Support
of Appellees.*

_____

OPINION OF THE COURT
_____

SMITH, *Circuit Judge*.

The Willow Inn received the final payment on its
property damage claim over two years after the building was
damaged by a tornado. Having encountered sustained
resistance to its insurance claim rather than cooperation in
settling it, Willow Inn, Inc. sued its real and personal property
insurance carrier, Public Service Mutual Insurance Company
("PSM"), asserting, *inter alia*, a $2,000 breach of contract
claim and unspecified punitive damages, attorney fees, and
costs pursuant to Pennsylvania's bad faith statute, 42 Pa.
Cons. St. § 8371. Following a bench trial, the District Court

3

awarded Willow Inn $2,000 in compensatory damages on the contract claim and $150,000 in punitive damages plus attorney fees and costs, later set at $128,075 and $7,372, respectively, on the bad faith claim.

On May 20, 2003, this Court upheld the compensatory award and the attorney fees and costs awards. We did not discuss, however, the District Court's findings that PSM had breached the insurance contract and had acted in bad faith under § 8371. Because the District Court had not addressed its punitive damages award in terms of the United States Supreme Court's guideposts enunciated in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), we vacated that award. We instructed the District Court to determine the appropriate punitive damages award in accordance with the Supreme Court's dictates in *Gore* and reinforced in *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408 (2003), which had been filed after the District Court's decision. The District Court's *Gore/Campbell* survey determined that its earlier award accorded with due process, and it reinstated the $150,000 punitive damages award. We affirm.

I.

On June 1, 1998, a tornado caused severe damage to the Willow Inn, a bar/restaurant and residence in Willow Grove, Pennsylvania. Within days of the storm Willow Inn

4

hired a public adjusting firm, Assured Adjustment, on a contingency fee to assist it in submitting its insurance claim to PSM. PSM retained McShea Associates to adjust the claim. On June 23, 1998, Assured Adjustment forwarded its initial claim estimate of $216,000 to McShea. On July 24, 1998, McShea countered with its initial claim estimate. Perhaps predictably, given their opposing incentives (Assured Adjustment to maximize the claim to increase its fee and Willow Inn's recovery, and McShea to minimize the claim to attract future PSM business), McShea's estimate of $90,000 was less than 45% of the one prepared by Assured Adjustment a month earlier.

At Willow Inn's request, on September 16, 1998, PSM advanced a $75,000 payment to its insured. Because of the variance between their estimates, Assured Adjustment and McShea retained a contractor to evaluate Willow Inn's loss and to facilitate negotiations. With the contractor's evaluation and following negotiations, Assured Adjusters and McShea agreed to a claim amount of $126,810, which McShea recommended to PSM on October 1, 1998. When PSM inexplicably failed to respond to its adjuster's correspondence for over a month, McShea iterated the recommendation on November 4, 1998.

On November 6, 1998, Willow Inn submitted to PSM a sworn Proof of Loss for $127,810, an amount that after the $1,000 deductible was the same as that agreed upon by

5

Assured Adjustment and McShea. Willow Inn also claimed an additional $2,000 for costs associated with preparing the Proof of Loss, the maximum allowed under a separate policy provision. On November 10, 1998, PSM rejected the $127,810 Proof of Loss, and did not respond to the $2,000 preparations costs claim. By this time PSM had hired another estimator, Casson Associates, to evaluate the claim.

Casson estimated Willow Inn's loss to be $91,312. On December 15, 1998, PSM authorized McShea to offer Willow Inn $16,312 (i.e., the Casson estimate less the $75,000 advance) to settle the claim. Willow Inn rejected this offer. On January 25, 1999, Willow Inn withdrew its adherence to the $126,810 proposed settlement, and, per the policy, requested an appraisal within 20 days.

On February 1, 1999, PSM refused the appraisal request, stating that it did not have a sworn Proof of Loss statement from Willow Inn and that it could not go forward with an appraisal because it was no longer established that a dispute in fact existed. The District Court found PSM's stated rationale for refusing to participate in the appraisal process to be disingenuous. Willow Inn had merely retreated from the settlement offer; it had not withdrawn its Proof of Loss statement. Despite repeated requests from Willow Inn, PSM did not submit to an appraisal until October 7, 1999. During the appraisal process, PSM relied on materially identical documents it originally averred were insufficient to document

the existence of a dispute. On July 5, 2000, the appraisal umpire fixed Willow Inn's property loss claim at $117,000, which, less the $75,000 advance, PSM paid on August 17, 2000. PSM did not pay the $2,000 preparations costs claim. Willow Inn filed this suit two months later.

The parties agreed to a bench trial. The District Court's January 2, 2002, Rule 52(a) Memorandum and Order awarded Willow Inn $2,000 on the breach of contract claim. The Court considered the policy provision defraying up to $2,000 of claimants' Proof of Loss preparations costs to be unambiguous, and found that the undisputed evidence at trial established that Assured Adjustment had reasonably expended "well in excess of the $2,000 policy limit" in preparing the Proof of Loss.

The District Court noted that bad faith under § 8371[1]

---

[1] Pennsylvania's bad faith statute provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of

must be proven by "clear and convincing evidence and not merely insinuated," *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994), such that it "enables a court to reach its decision with 'a clear conviction.'" *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 751 (3d Cir. 1993).

The District Court then wrote,

Mindful of this high standard, I find that PSM's conduct constituted "bad faith" as contemplated by section 8371. Specifically, unreasonable delays in the processing of the Willow Inn's claims were extraordinarily unwarranted such that there can be no conclusion except that PSM knowingly or recklessly disregarded the absence of a reasonable basis for its conduct. The record is replete with examples of PSM's failure to respond in a timely fashion to Willow Inn's various reasonable requests, and even to the

---

interest plus 3%.
(2) Award punitive damages against the insurer.
(3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. St. § 8371.

8

requests of those working on PSM's behalf. As one egregious example, PSM's unjustified delay in appointing an appraiser prevented the appraisal from commencing, despite the Willow Inn's and its adjusters' diligent efforts, until more than eight months after the Willow Inn's initial appraisal request. Similarly, PSM failed to pay the Willow Inn for its costs incurred in preparing proof of the Willow Inn's loss, or to even acknowledge the Willow Inn's request for more than three months, despite ample evidence that the Willow Inn was entitled to this compensation. While each of these examples standing alone evinces bad faith, this conclusion becomes even stronger when one considers the abundance of evidence presented at trial pointing out the dramatic contrast between the Willow Inn's conscientious efforts and PSM's reckless and obstructive actions. *See also* 31 Pa. Code § 146.7(a)(1) (insurer must provide notice of its decision to insured within fifteen (15) working days after receipt of a proof loss).

Though "cognizant of multi-million dollar punitive damage awards in section 8371 cases," the District Court concluded that "$150,000 is an appropriate, adequate, and reasonable award." The court also indicated that it would "award appropriate fees and costs after considering Plaintiff's

9

counsel's forthcoming petition." After considering Willow Inn's petition and the parties' briefs, on April 11, 2002, the District Court awarded Willow Inn $128,075 in attorney fees and $7,372 in costs.

PSM appealed the District Court's breach of contract and bad faith findings, its exercise of discretion in awarding attorney fees and costs, and its punitive damages assessment, which PSM argued was constitutionally excessive. We summarily affirmed the District Court's decision with respect to the first three issues, having granted argument limited to the punitive damages award. We vacated and remanded that award to the District Court with instructions to apply the *Gore/Campbell* guideposts. *Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.*, 66 Fed. Appx. 398, 2003 U.S. App. LEXIS 9767 (3d Cir. May 20, 2003) (Not Precedential).

On remand, the District Court declared its $150,000 punitive damages award not to be constitutionally excessive. Following the three *Gore/Campbell* guideposts, the District Court first found PSM's behavior reprehensible due to Willow Inn's financially vulnerable position, the repeated misconduct of PSM, and because the unreasonable delay in PSM's payment of the claim was not "mere accident." Next, the District Court found the appropriate ratio of the punitive damages penalty to the harm caused by PSM's conduct to be approximately 1:1, because "the punitive damages award of $150,000 is approximately equal to the value of the Willow

10

Inn's claim under the policy and the payment that it belatedly received." As to the guidepost of other sanctions that could be imposed for comparable misconduct, the District Court reasoned that the significant attorney fees authorized under § 8371 evince the Pennsylvania legislature's intent to hold insurers accountable for acting in bad faith, and that the significant attorney fees awarded in prior cases gave PSM notice that its conduct would subject the company to punishment.

## II.

The District Court exercised diversity jurisdiction under 28 U.S.C. § 1332(a); this Court has final order jurisdiction under 28 U.S.C. § 1291. We review *de novo* the District Court's decision upholding the constitutionality of the amount of its punitive damages award. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 431 (2001). More specifically, we must "engage[] in an independent examination of the relevant criteria," *id*. at 435, to determine whether the punitive damage award is so "grossly disproportional" to the defendant's conduct as to amount to a constitutional violation. *Id.* at 434 (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).

## III.

Due process demands that a defendant "receive fair

notice not only of the conduct that will subject him to punishment, but also of the penalty the State may impose." *Gore*, 517 U.S. at 574. Thus, punitive damages awards must not be disproportionately excessive to the degree of reprehensibility of the defendant's conduct and the harm that conduct visited upon the plaintiff, and the award must not exceed the state legislature's judgment of the appropriate sanctions for the conduct. *Campbell*, 538 U.S. at 418. Addressing each of the three *Gore/Campbell* guideposts, and acknowledging the "inherent imprecision" of the substantive due process analysis, we consider the $150,000 punitive damages to approach but not cross the constitutional line. *See Cooper Indus.*, 532 U.S. at 434-35 ("[T]he relevant constitutional line is 'inherently imprecise,' rather than one 'marked by a simple mathematical formula.'") (citations omitted).

*Degree of Reprehensibility*

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. Just as criminal sanctions are calibrated to comport with the gravity of the offender's conduct, so should the amount of the punitive damages imposed on a defendant "reflect[] the accepted view that some wrongs are more blameworthy than others." *Id*.

Given the procedural posture of this case, we find especially salient the Supreme Court's observation that with respect to the reprehensibility inquiry, "the district courts have a somewhat superior vantage over courts of appeal, and even then the advantage exists primarily with respect to issues turning on witness credibility and demeanor." *Cooper Indus.*, 532 U.S. at 424. The District Judge presided over this case for well over a year and ruled on the defendant's motion for summary judgment and countless non-dispositive motions. During a two day bench trial the District Judge heard testimony from witnesses and observed their demeanor. The trial transcript reveals several instances in which the District Judge questioned witnesses and cited specific pages of the record to which counsel had alluded before counsel themselves could locate the pages. The transcript reveals a district judge who was deeply engaged in the proceedings and who had a thorough grasp of the evidence. Most importantly, the critical input to the reprehensibility calculus in this case is whether the delay in settling the claim was due to legitimate differences of opinion over its value or, rather, to PSM's dilatoriness and inertia. This evaluation was best made by the judge who heard the testimony and observed the demeanor of all of the significant participants – adjusters, contractors, and claims agents – involved in Willow Inn's claim.

Further, the importance of the District Court's superior vantage is magnified in bench trials. When the Supreme Court articulated *de novo* review of punitive damages awards,

13

it was in the usual context of an appellate court "passing on district courts' determinations of the constitutionality of punitive damages awards" made by juries. *Id.* at 436. The concerns undergirding *de novo* review may be tempered somewhat, however, when a federal district judge, rather than a local jury, is the factfinder setting the punitive damages award. In such a case, the potential for an ill-founded or inflated reprehensibility determination is less.

While due process demands that states guide the discretion of juries contemplating punitive damages awards, *Cooper Indus.*, 532 U.S. at 433, concerns of judicial overreaching dictate that trial judges view jury determinations of appropriate punitive damages with a measure of deference. *See Dunn v. HOVIC*, 1 F.3d 1371, 1381 (3d Cir. 1993) (*en banc*) (determining that due process is satisfied where a district court accords a jury's punitive damages award "substantial deference" while "remit[ting] the portion of the verdict in excess of the maximum amount supportable by the evidence") (internal quotation marks omitted). If a jury's punitive damages award is free of irrationality, passion, and prejudice, and falls within the "broad discretion in authorizing and limiting permissible punitive damages awards" lodged with state legislatures, *Cooper Industries*, 532 U.S. at 433; *see Campbell*, 538 U.S. at 418, a trial judge should not substitute his or her view of the appropriate amount of punitive damages for the jury's determination. Similarly, the touchstone of appellate review of punitive damages awards is

14

reasonableness, not exactitude. *Gore*, 517 U.S. at 582; *see Haslip*, 499 U.S. at 20 ("As long as the discretion is exercised within reasonable constraints, due process is satisfied."). If a court determines that a jury's punitive damages award is constitutionally excessive, *Dunn* indicates that the court should decrease the award to an amount the evidence will bear, which amount must necessarily be as high – and may well be higher – than the level the court would have deemed appropriate if working on a clean slate. 1 F.3d at 1381. The danger inherent in the typical procedure – i.e., for punitive damages awards to creep toward the constitutional limit as the potential prejudice infecting a jury's reprehensibility analysis and its punitive damages calculus can be tempered but not eliminated by remittitur – is allayed when a federal judge sets the amount of punitive damages as an initial matter.

In sum, while the reprehensibility of PSM's conduct is not a "fact" established at trial, *see Cooper Industries*, 532 U.S. at 437, that the quantum of reprehensibility necessary to support the punitive damages award was determined to exist by a judge exercising diversity jurisdiction lessens our concern that the conclusion was the product of local bias, distaste for corporate defendants, or sympathy for the plaintiff.

The Supreme Court has parsed the reprehensibility analysis into five subfactors, three of which – the financial vulnerability of the plaintiff, that the conduct involved

15

repeated actions by the defendant, and that the harm was intentionally inflicted – the District Court determined were applicable to this case. *See Gore*, 517 U.S. at 576-77; *Campbell*, 538 U.S. at 419. We agree with the District Court that Willow Inn was financially vulnerable, and that its need for the insurance proceeds was "particularly pressing." Though no documents related to Willow Inn's financial standing were introduced at trial, the trial testimony amply supports the District Court's finding. For example, the uncontroverted testimony of Gerald DiMarzio, a Willow Inn co-owner, was that in the 36 hours following the tornado, he and neighborhood volunteers fastened tarps to cover holes in the roof and exterior of the building, and cleared debris from the building and its grounds to make the area less hazardous. His testimony established that the Willow Inn is unquestionably a modest family-run business, and is not an enterprise with the resources to have had its premises repaired professionally without the benefit of insurance proceeds.

The District Court noted that the delay in settling and paying Willow Inn's claim "was not the result of one specific event, but, rather, a series of instances in which PSM failed or refused to act on Plaintiff's claim." The District Court considered this conduct to evince reprehensibility because "repeated conduct is more reprehensible than an individual instance of malfeasance." *Gore,* 517 U.S. at 577. The District Court seems to have misinterpreted this subfactor, at least as it has been applied by the Supreme Court. The

"repeated conduct" cited in *Gore* involved not merely a pattern of contemptible conduct within one extended transaction (i.e., the sale of one automobile to Dr. Gore), but rather specific instances of similar conduct by the defendant in relation to other parties. In *Gore*, the behavior the plaintiff argued was recidivistic involved BMW selling repainted cars as "new" to 1,000 people, all but fourteen of whom lived in other states. The claimed recidivistic behavior did not refer to the series of steps that amounted to the alleged fraud related to Dr. Gore's automobile. Similarly, in *Campbell*, the plaintiffs essentially attempted to put State Farm's policy for minimizing claims on trial. The "repeated conduct" alleged in *Campbell* related to the insurer's nationwide claims handling practices across thousands of claims, not to the series of unreasonable decisions various State Farm employees made in handling the Campbells' specific claim.

Here, the District Court improperly considered the various stonewalling tactics employed by PSM in processing Willow Inn's claim to satisfy the "repeated conduct" reprehensibility subfactor of *Gore* and *Campbell*. Notwithstanding this misinterpretation, however, we consider this subfactor to be relevant, but with less force, insofar as the series of actions and inaction by PSM which delayed settlement of the claim until more than two years after the windstorm implied a concerted effort to lessen PSM's expected payment on the claim. PSM's pattern of delay suggests that its actions were designed to achieve a fiscally

17

beneficial result for itself at odds with the Pennsylvania Supreme Court's long-time dictate that an insurer must act with the "utmost good faith" toward its insured. *Fedas v. Insurance Co. of Penn.,* 151 A. 285, 286 (1930).

As noted by the District Court, valid claimants who were less diligent than Willow Inn in pressing their claims, when confronted with similar behavior by PSM, would have abandoned their claims in frustration. We have little doubt that had Willow Inn not vigorously pursued a final settlement, PSM would not have made payment beyond the $75,000 advance. Indeed, the dilatory tactics of PSM effectively produced an interest-free loan to PSM from Willow Inn of the difference between the advance and the value of the claim for as long as PSM was able to stretch out payment. In this regard, we think the *Gore/Campbell* "repeated conduct" subfactor applies to this case in a way not captured in the "intent" subfactor, to which we now turn.

The District Court concluded that the unreasonable delay here was due to PSM's intentional stonewalling and was not the result of "mere accident." *Campbell,* 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576-77). We agree. The trial transcript indicates that PSM repeatedly asked Willow Inn for documentation that the insured had already submitted or was otherwise unnecessary; that PSM unreasonably asserted that no dispute warranting an appraisal existed and told its appraiser to freeze the appraisal process; and that PSM

18

withheld the difference between the lowest pre-appraisal estimate and its advance payment on the unreasonable ground that the appraisal might be returned in an amount less than the lowest estimate.  In short, PSM's conduct in settling and paying Willow Inn's claim was a mix of purposefully indifferent inaction and intentionally dilatory action.

Our reprehensibility review is not an exhaustive catalog of PSM's misconduct.  As indicated by the District Court, the trial transcript reflects "the abundance of evidence presented at trial pointing out the dramatic contrast between the Willow Inn's conscientious efforts and PSM's reckless and obstructive actions."  For example, among the actions and inactions by PSM indicative of bad faith, but not mentioned by the District Court, was PSM's inappropriate vagueness in rejecting the settlement recommended by McShea, PSM's persistent and unvarying attempts to lowball Willow Inn regarding construction materials, and PSM's neglect in failing to keep Willow Inn reasonably apprised of the status of its claim.  Acknowledging, too, that the reprehensibility analysis is rightly augmented by the demeanor evidence available only to the District Judge, we cannot conclude that the punitive damages award here is out of proportion to the reprehensibility of PSM's conduct.

*Ratio of Punitive Damages to Harm*

"The second and perhaps most commonly cited

indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580. The constitutionally acceptable range is not reducible to a "simple mathematical formula," *id.* at 582, and the Supreme Court has been "reluctant to identify concrete constitutional limits on the ratio." *Campbell*, 538 U.S. at 424. Rather, the ratio of punitive damages to the harm caused by the defendant is a tool to ensure that the two bear a reasonable relationship to each other. *Gore,* 517 U.S. at 580; *Campbell*, 538 U.S. at 426. While "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *Campbell*, 538 U.S. 425, greater ratios "may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *Id*. (quoting *Gore*, 517 U.S. at 582).

The Supreme Court's ratio discussions evidence a concern that the punishment should fit the crime, and imply the general observation that conduct that visits great economic harm onto a plaintiff is likely to be more culpable than where the stakes are lower. The Supreme Court has never suggested, for example, that a large compensatory award could sustain a significant punitive damages award, regardless of the resulting compensatory to punitive damages ratio, where the underlying conduct was not of punishable character.

20

Accordingly, the question becomes: What figure comprises the second term of the ratio to compare to the $150,000 punitive damages award? There is no shortage of candidates. The District Court used the amount of "Willow Inn's claim under the policy and the payment that it belatedly received" – approximately $125,000 – creating a ratio of roughly one to one. To reach this ratio, the District Court reasoned that because Willow Inn had to be uncommonly diligent in asserting its claim in the face of PSM's mix of obstructionism and passivity, the entire claim amount was the potential harm. The District Court cited *TXO Productions*, the seminal "potential harm" case, for the proposition that a plaintiff's potential harm and not its actual harm is the relevant term to compare to the punitive damages award. *See TXO Productions*, 509 U.S. at 462. We do not agree that this is a "potential harm" case or that the claim amount is the proper figure of comparison. In *TXO Productions*, the defendant attempted to defraud the plaintiff out of potentially lucrative royalties of which the plaintiff was unaware. The lesson of *TXO Productions* is that punitive damages amounts need not be tethered to the small actual harm frauds visited upon their victims. Rather, just as the criminal justice system punishes attempts to commit crime with roughly the same severity as it does substantive offenses, punitive damages awards can match the scale of the attempted swindle. Here, PSM was merely unreasonable in not settling and paying Willow Inn's claim in a fair and timely manner. Willow Inn's claim was limited to repairing wind damage, so *TXO*

21

*Production's* potential harm analysis is inapposite.[2]

PSM and its amicus argue that the $2,000 award on Willow Inn's contract claim is the compensatory award, and that *Campbell's* "single-digit" ratio guidance caps the punitive damages award at $18,000. Though this solution has the virtue of clarity, the $2,000 is a red herring, and we do not adopt it as a term of the ratio analysis. The $2,000 award relates to only one aspect of PSM's bad faith conduct – its unreasonable refusal to pay on the policy provision defraying Willow Inn's costs of preparing the Proof of Loss – and is in no way indicative of the sum of PSM's culpability.[3] Section 8371 allows punitive damages awards even in the absence of other successful claims brought by the plaintiff, *see March v. Paradise Mut. Ins. Co.*, 646 A.2d 1254, 1256 (Pa. Super. 1994), in which case, according to PSM's argument, it would

---

[2] PSM's handling of Willow Inn's claim was marked by dissembling and feigned ignorance; PSM's conduct is not fairly characterized as fraudulent. In any event, PSM never contested liability, so the entire claim amount – a disputed but not hidden figure – was never in jeopardy. The District Court did not note PSM's $75,000 advance to Willow Inn in its analysis. Though this payment four months after the windstorm was not a model of timeliness, it at least indicates that the entire cost of repairing the Willow Inn was not at risk.

[3] The $2,000 figure reflects the ceiling on insurance proceeds available pursuant to that policy provision.

22

be impossible to formulate a ratio. Thus, as here, when an insurance claim has been settled and paid, Pennsylvania's bad faith statute provides insurance claimants a means of redressing unreasonable delays by their insurers. *Klinger v. State Farm Mut. Auto. Ins. Co.,* 115 F.3d 230, 236 (3d Cir. 1997) (upholding a $150,000 punitive damages award on a § 8371 delay claim where the insurance claim had been settled by an arbitrator before the bad faith claim was filed). Therefore, we view the $2,000 award on Willow Inn's contract claim to be incidental to the punitive damages award. It would be an improper term to use in the ratio analysis.

Willow Inn argues that the term for ratio purposes should include the amount of the claim, attorneys fees and costs, and should consider the potential profits PSM would reap from deploying similar stonewalling tactics as its normal operating procedure. Willow Inn urges that additur into the millions of dollars is needed to deter PSM from viewing grudging claims settlement as a revenue stream, i.e., earning interest on payments delayed and reducing claims payments by getting valid claims holders to abandon their claims in frustration. We reject this approach not only because Willow Inn did not prove at trial that PSM's conduct here was typical of its claims handling practices, but because we believe the $150,000 punitive damages award approaches the constitutional limit given the reprehensibility of PSM's conduct.

23

As Willow Inn's main insurance claim had been settled before this case was brought, and because the $2,000 award on the contract claim was only incidental to the bad faith thrust of this litigation, we conclude that the attorney fees and costs awarded as part of the § 8371 claim is the proper term to compare to the punitive damages award for ratio purposes. These awards totaled $135,000, resulting in approximately a 1:1 ratio, which is indicative of constitutionality under *Gore* and *Campbell*.

We acknowledge that this conclusion is not without conceptual difficulty. The purpose of Pennsylvania's bad faith statute and the language establishing the ratio analysis in *Gore* and *Campbell* are in tension. Section 8371 empowers a court which finds "that the insurer has acted in bad faith toward the insured" to award interest, shift the insured-plaintiff's court costs and attorney fees to the insurer-defendant, and impose punitive damages. The statute evinces Pennsylvania's policy that whereas parties act at arm's-length when negotiating insurance contracts, insurers must deal fairly and not in their narrowly-defined economic self-interest[4] when their insureds submit claims in good faith. *See*

---

[4] The modifier "narrowly-defined" is used here to isolate an insurer's economic self-interest to minimizing and delaying claims payments in any given claim. A broader conception of economic self-interest would include, for example, the reputational effects of an insurer becoming known for

*Romano v. Nationwide Mut. Fire Ins. Co*., 646 A. 2d 1228, 1231 (Pa. Super. 1994). *Gore* states that the ratio analysis is intended to ensure that a punitive damages award reasonably relates "to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580; *accord Campbell*, 538 U.S. at 425. Pennsylvania policy and the *Gore/Campbell* ratio language collide where, as here, an insurer's conduct in settling and paying a claim is unacceptable, but where the claim itself was settled and paid prior to the commencement of a § 8371 action.

The attorney fees and costs here were awarded in the insured's bad faith suit, not in a suit to settle the main underlying insurance claim, which eventually PSM paid. Therefore, it is something of a stretch to say that PSM "inflicted" Willow Inn's attorney fees and court costs on it. On the other hand, § 8371 would be useless where, as here, the allegation is that the insurer acted in bad faith by unreasonably delaying settlement. Section 8371's attorney fees and costs provisions vindicate the statute's policy by

---

grudgingly settling and slowly paying claims. While other states may rationally adopt a more laissez-faire stance, Pennsylvania's bad faith statute suggests that the state legislature does not believe the prospect of a bad reputation in handling claims is sufficient deterrent to guarantee that insurers maintain a threshold level of diligent, competent, and fair claims settlement and payment.

enabling plaintiffs such as Willow Inn to bring § 8371 actions alleging bad faith delays to secure counsel on a contingency fee. Moreover, "one function of punitive-damages awards is to relieve the pressures on an overloaded system of criminal justice by providing a civil alternative to criminal prosecution of minor crimes," *Mathias v. Accor Economy Lodging, Inc*., 347 F.3d 672, 676 (7th Cir. 2003), and the structure of § 8371 enlists counsel to perform a filtering function akin to prosecutorial discretion, because rational attorneys will refuse to work on a contingent fee arrangement when their investigation reveals the bad faith allegations of prospective clients to be meritless.

Our decision to include awards of attorney fees and costs in the ratio analysis is supported in the case law. A recent en banc panel of the Superior Court of Pennsylvania was unanimous in considering § 8371's attorney fees and costs awards to be compensatory damages for *Gore/Campbell* multiplier purposes. *Hollock v. Erie Ins. Exch.*, 842 A.2d 409, 421 (Pa. Super. 2004) (en banc) (eight-judge majority opinion); *id*. at 424 (Klein, J., dissenting) (two judges dissenting in the judgment, but agreeing with the majority that attorney fees should be considered in establishing the ratio). Given the unanimity of the Superior Court on the point and the policy underlying § 8371, we believe the Pennsylvania Supreme Court would adopt the Superior Court's view. *See West v. American Tel. & Tel. Co.,* 311 U.S. 223, 236 (1940); *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*,

26

652 F. 2d 1165, 1167 (3d Cir. 1981) ("[I]n the absence of an authoritative pronouncement from the state's highest court, the task of a federal tribunal is to predict how that court would rule."). We recognize, too, that the Superior Court's *Hollock* decision is not purely its interpretation of Pennsylvania's bad faith statute to which we must defer, but rather is its judgment of how the statute fits a federal constitutional scheme. *See Missouri v. Hunter*, 459 U.S. 359, 368 (1983) (stating that although federal courts are bound to the construction of a state statute by the state's highest court, federal courts are not bound to their conclusions of whether the interpretation comports with the federal Constitution). We find persuasive and reasonable *Hollock's* conclusion that an award of attorney fees and costs pursuant to § 8371 is an apt term in the *Gore/Campbell* ratio analysis. Moreover, it accords with this Court's prior discussion of the bad faith statute's attorney fees provision. *Klinger*, 115 F.3d at 236 ("Attorney's fees ... are awarded to compensate the plaintiff for having to pay an attorney to get that to which they were contractually entitled. ... The obvious design of the Pennsylvania statute is, first, to place [plaintiffs] in the same economic position they would have been in had the insurer performed as promised, by awarding attorney's fees as additional damages; and second, to punish [the insurer] for giving primacy to its own self-interest over that of the [insureds] by awarding punitive damages.").

Our conclusion that attorney fees and costs awarded

27

pursuant to § 8371 are compensatory damages for *Gore/Campbell* ratio purposes creates an approximately 1:1 ratio in this case. Further, we consider the relationship between punitive and compensatory damages here to be reasonable given the degree of reprehensibility of PSM's conduct.

*Civil Penalties*

"The third guidepost in *Gore* is the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" *Campbell*, 538 U.S. at 428 (quoting *Gore*, 517 U.S. at 575). This guidepost reflects a "deference to legislative judgments concerning the appropriate sanctions for the conduct at issue," *Gore*, 517 U.S. at 583 (citation and internal citation omitted), and provides notice of possible sanctions to potential violators. *Id*. at 584.

The District Court on remand wrote, "Because attorney's fees are authorized by section 8371– and have been granted in amounts roughly equal to the punitive damages award in this case – the relevant considerations under the third guidepost also support the imposition of the $150,000 award." We believe the District Court is mistaken to consider attorney fees to be a "civil penalty." A "civil penalty" is a "fine assessed for a violation of a statute or regulation," and as such are paid to the government, not to the opposing party or their

counsel. Black's Law Dictionary 1168 (8th ed. 2004). However, the Supreme Court has suggested that a loss of one's business license might count as a civil penalty for purposes of due process review of punitive damages awards, *see Campbell*, 538 U.S. at 428, an interpretation that has been adopted by the Seventh Circuit. *Mathias*, 347 F.3d at 678 (upholding an $186,000 punitive damages award on a $5,000 compensatory award under the third guidepost of *Gore/Campbell* because the court was "sure that the defendant would rather pay the punitive damages assessed in this case than lose its license").

Here, both parties agree that the most applicable civil penalty is contained in Pennsylvania's Unfair Insurance Practices Act, 40 Pa. Cons. St. § 1171, which includes a penalty of up to $5,000 for knowingly "failing to acknowledge and act promptly upon written or oral communication with respect to claims arising under insurance policies, if committed or performed with such frequency as to indicate a business practice." 40 Pa. Cons. St. § 1171.5(a)(10)(ii). The punitive damages amount here is 30 times as large as the civil penalty. However, the Supreme Court has not declared how courts are to measure civil penalties against punitive damages, and many courts have noted the difficulty in doing so. *See, e.g., BMW of N. Am. v. Gore*, 701 So. 2d 507, 514 (Ala. 1997) (remand from Supreme Court) (finding the "consideration of the statutory penalty does little to aid in a meaningful review of the

excessiveness of the punitive damages award" and remitting the punitive damages to a figure 25 times the maximum civil penalty); *Campbell v. State Farm Mut. Auto. Ins. Co.*, 98 P.3d 409, 419 (Utah 2004) (remand from Supreme Court) (terming this comparison "quixotic" and remitting punitive damages to a figure 900 times the maximum statutory penalty). We are similarly unsure as to how to properly apply this guidepost, and we are reluctant to overturn the punitive damages award on this basis alone. We note that PSM's conduct arguably amounted to multiple violations of § 1171, and that the statute provides for escalating civil penalties for repeat violations, up to and including the suspension and revocation of one's license to issue insurance policies. 40 Pa. C.S.A. § 1171.9. We believe that the punitive damages award here honors the Pennsylvania legislature's judgment of appropriate sanctions for PSM's conduct, as evidenced in various provisions of the state's Unfair Insurance Practices Act.

IV.

Because our independent review of the $150,000 punitive damages award in light of the *Gore/Campbell* guideposts indicates that the award is not constitutionally excessive, we affirm the judgment of the District Court.

30