

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-23-2007

# CGB Occupational v. RHA Health Ser Inc

Precedential or Non-Precedential: Precedential

Docket No. 05-3409

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"CGB Occupational v. RHA Health Ser Inc" (2007). *2007 Decisions*. Paper 492.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/492

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos: 05-3409, 05-3586
_____

CGB OCCUPATIONAL THERAPY, INC.
d/b/a CGB REHAB, INC.

v.

RHA HEALTH SERVICES, INC.; SYMPHONY HEALTH
SERVICES INC.;
RHA PENNSYLVANIA NURSING HOMES, INC.,
d/b/a PROSPECT PARK REHABILITATION CENTER
d/b/a PROSPECT PARK NURSING CENTER
d/b/a PROSPECT PARK HEALTH AND
REHABILITATION RESIDENCE;
RHA PENNSYLVANIA NURSING HOMES, INC.
d/b/a PEMBROOKE NURSING AND REHABILITATION
CENTER
d/b/a PEMBROOKE NURSING AND REHABILITATION
RESIDENCE
f/k/a WEST CHESTER ARMS NURSING AND
REHABILITATION CENTER;
SUNRISE ASSISTED LIVING, INC.; SUNRISE ASSISTED
LIVING MANAGEMENT, INC.


Sunrise Senior Living, Inc.

Sunrise Senior Living Management Inc.,

Appellants in 05-3409

CGB Occupational Therapy, Inc.,

Appellant in 05-3586

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 00-cv-04918)
District Judge:  Honorable Clarence C. Newcomer

_____

Argued March 26, 2007

Before:   FISHER, JORDAN and ROTH, *Circuit Judges*

(Filed: August 23, 2007)

_____

Evan M. Tager  **[ARGUED]**
Mayer, Brown, Rowe & Maw LLP
1909 K Street, NW
Washington, DC 20006
    *Counsel for Appellants/Cross-Appellees*

2

Andrew L. Frey
Lauren R. Goldman
Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, NY   10019

David G. Concannon   **[ARGUED]**
Suite 116
200 Eagle Road
Wayne, PA   19087
   *Counsel for Appellee/Cross-Appellant*

————————

OPINION OF THE COURT
————————

JORDAN, *Circuit Judge*.

Before us are cross-appeals arising from the reduction of a $30 million punitive damages verdict to $2 million.  The District Court ordered the reduction on the ground that the verdict was constitutionally excessive.  Defendants Sunrise Assisted Living Management, Inc. and Sunrise Assisted Living, Inc. (collectively, "Sunrise") contend that the reduced verdict is still unconstitutional and seek a further reduction.  In a cross-appeal, Plaintiff CGB Occupational Therapy, Inc. ("CGB") challenges the District Court's reduction of the verdict and seeks either reinstatement of the original verdict or some enhancement of the reduced verdict.  For the reasons that follow, we will vacate the District Court's remittitur order

3

and remand the case with instructions to enter a new judgment for punitive damages in the amount of $750,000. CGB's cross-appeal will be dismissed.

I.

This case is before us for the second time, following a second jury trial. It is, as we said on the first go-around, a case that "has been characterized by its contentious history." *CGB Occupational Therapy, Inc. v. RHA Health Serv., Inc.*, 357 F.3d 375, 379 (3d Cir. 2004) ("*CGB I*"). Since we have previously set forth the facts in detail, the following factual recitation is limited to the background necessary for our ruling.

CGB is a provider of rehabilitation therapy services in long-term care and assisted-living facilities. Beginning in 1995, CGB contracted with a company known as RHA Pennsylvania Nursing Homes ("RHA") to provide physical, occupational, and speech therapy to residents at two nursing home facilities owned by RHA, the Pembrooke facility and the Prospect Park facility. CGB's agreements with RHA contained an "anti-raiding" clause providing that, in the event CGB was terminated as the provider of therapy services, the Pembrooke and Prospect Park facilities would not, for a period of twelve months, seek to hire or contract with therapists employed by CGB.

At all times relevant to this case, Sunrise managed RHA's Pembrooke and Prospect Park facilities. In 1998, the federal Medicare program altered its process for reimbursing care facilities for therapy services provided to residents.

4

Under the revised process, RHA claimed that it was more difficult to pay CGB, and, on June 30, 1998, at RHA's direction, Sunrise notified CGB in writing that RHA intended to terminate its contracts with CGB, effective September 30, 1998. Almost immediately after giving that notice, Sunrise, again acting on behalf of RHA, executed agreements with another provider of therapy services, Symphony Health Services, Inc. ("Symphony"), to retain Symphony as the new therapy provider at both the Pembrooke and Prospect Park facilities, effective October 1, 1998.

What followed is central to this bitter legal contest. Sunrise's Prospect Park Administrator, Marjorie Tomes, met with certain CGB therapists at the end of July 1998. She did so despite the anti-raiding clause in RHA's contracts with CGB and despite direct admonitions by both RHA and CGB that no such meeting should occur. During that meeting, Tomes informed the therapists that CGB's contracts with RHA had been terminated because CGB could not comply with Medicare changes. She made that representation even though CGB's owner, Cindy Brillman, had repeatedly told her that CGB could comply with the Medicare requirements and could continue to be competitive in providing therapy services. Tomes also told the therapists that Symphony would replace CGB as the therapy contractor, and that they might have employment opportunities with Symphony. She polled the therapists for their interest in pursuing employment with Symphony, wrote down the names of those who replied in the affirmative, and proceeded to facilitate Symphony's hiring of CGB therapists.

In September 2000, CGB brought this action against Sunrise and other defendants, alleging claims under Pennsylvania law for, among other things, tortious interference with CGB's contractual relationships both with its therapists and with RHA. The jury in the first trial found that Sunrise had indeed tortiously interfered with CGB's contractual relationship with its therapists, and returned a compensatory damages verdict in the amount of $109,000 on that claim. The jury also found that Sunrise had tortiously interfered with CGB's contractual relationship with RHA, and returned compensatory damages in the amount of $576,000 on that claim. The jury awarded punitive damages to CGB in the amount of $1.3 million, but the verdict did not specify how the punitive damages award was allocated between the two claims of interference.

On the first appeal, we affirmed the jury's verdict against Sunrise for tortious interference with CGB's contractual relationship with its therapists, but we reversed the verdict of tortious interference with CGB's contractual relationship with RHA. *See CGB I*, 357 F.3d at 385-90.[1] Because the jury had awarded $1.3 million in punitive

---

[1]We reversed the verdict on the claim of tortious interference with CGB's contractual relationship with RHA because we determined that Sunrise acted within the scope of its authority as an agent for RHA, *CGB I*, 357 F.3d at 385-88, and that, under Pennsylvania law, "[t]he actions of a principal's agent are afforded a qualified privilege from liability for tortious interference with the principal's contract." *Id.* at 385.

damages without differentiating between the two acts of interference by Sunrise, we noted that "it is impossible to determine how punitive damages should be allocated in light of our determination that Sunrise could not have interfered with the contract between CGB and [RHA]." *Id.* at 390. Consequently, we reversed the punitive damages determination and remanded the case to the District Court for "a new trial on the question of punitive damages." *Id.* at 392.

Sunrise evidently had a "watch what you wish for" experience when, at the second trial, the jury awarded CGB $30 million in punitive damages on the claim that Sunrise had tortiously interfered with CGB's contractual relationship with its therapists. Sunrise thereafter moved to reduce the punitive damages award, arguing that the $30 million penalty was constitutionally excessive. After considering the guideposts for judicial review of punitive damages as articulated in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996), and as amplified by *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), the District Court reduced the award to $2 million. These cross-appeals followed. The District Court exercised diversity jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction over the final judgment pursuant to 28 U.S.C. § 1291.

## II.

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Campbell*, 538 U.S. at 416. In determining whether a punitive damages award

7

comports with due process,[2] courts must "consider three

[2] On the first appeal, Sunrise did not argue that the $1,300,000 punitive damages award was constitutionally excessive. Rather, it contended that the jury's punitive damages verdict should be overturned altogether because CGB had failed to establish the necessary elements of its tortious interference claims. *CGB I*, 357 F.3d at 383. Sunrise now asserts that a punitive damages award of $2,000,000 is constitutionally excessive, which raises the issue of whether it is appropriate to address this argument even though a similar argument was not made in the first appeal. Unlike our dissenting colleague, we conclude that the constitutional issue is unavoidable.

The dissent argues that it was inappropriate for the District Court to conduct a new trial to redetermine punitive damages *de novo*. We cannot agree. In *CGB I*, we declared that it was impossible to determine how the punitive damages could properly be allocated between the surviving claim and the claim we reversed. *Id.* at 390. Therefore, we also "reverse[d] the punitive damages determination and remand[ed] to the District Court for a redetermination of punitive damages in accordance with [that] opinion." *Id.* While our dissenting colleague interprets our "redetermination of punitive damages" instruction in *CGB I* to require something short of conducting an entirely new trial on the issue, we expressly clarified our intent later in *CGB I* by stating that "the jury's punitive damages determination must be reversed and the case remanded for a *new trial on the question of punitive damages,*" *id.* at 392 (emphasis added), and we further noted that claims of juror misconduct raised by

Sunrise were rendered moot by that disposition. *Id.* Thus, the District Court did what we instructed. It held a new jury trial on punitive damages, resulting in a new determination of those damages. *See Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1513-14 (11th Cir. 1987) (en banc) (reversal of one claim on which unapportioned punitive damages award was partially based had the effect of "void[ing] the original judgment," and "the litigants were sent back to the district court for a new determination of punitive damages as if the first trial never occurred"); 5 C.J.S. *Appeal and Error* § 1106 (2007) (the effect of a reversal of a judgment "is to nullify it completely and to leave the case standing as if such judgment ... had never been rendered, except as restricted by the opinion of the appellate court").

Courts have "broad discretion" in their control and management of a new trial. *Cleveland by and through Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1449 (10th Cir. 1993); *see also* 11 Wright, Miller, & Kane, *Federal Practice and Procedure: Civil* § 2803 (2d ed. 1995). Courts exercise that discretion in deciding whether to allow additional witnesses and relevant proof in the new trial. *See Piper Aircraft Corp.*, 985 F.2d at 1450 ("[T]he court must retain broad latitude and may with proper notice allow additional witnesses and relevant proof [in a new trial.]"). That discretion logically extends to making determinations of whether parties may make additional arguments in a new trial or in an appeal of that trial. Those decisions, and all others, should be guided by "considerations of fairness and justice to all parties." Wright, Miller, & Kane, *supra*, at § 2803; *see also Piper Aircraft Corp.*, 985 F.3d at 1450 (stating that, in

9

guideposts:  (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *Id.* at 418 (citing *Gore*, 517 U.S. at 575).  We review the constitutionality of the punitive damages award de novo, but we must accept any findings of fact made by the District Court, unless they are clearly erroneous.  *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 440 n.14 (2001).  We conclude that the $2 million award remains constitutionally excessive and must be further reduced.

---

considering whether to allow a party to introduce additional witnesses and relevant proof, a court should examine whether the allowance would create a "manifest injustice" to the other party).

Thus, when the jury returned a $30,000,000 punitive damages award against Sunrise, it is hardly surprising the District Court determined that the parties were in an entirely new region of liability exposure and that it was appropriate to permit Sunrise to argue that the new and much larger award was constitutionally excessive.  In so ruling, the District Court did not abuse its discretion.  Significantly, CGB has not contended it is unfair to permit Sunrise to raise a due process argument regarding the new verdict in either its original form or its reduced, $2,000,000 amount, although CGB has argued it is "disingenuous" for Sunrise to complain about the $2,000,000 verdict since it is "only $700,000 higher than the first [$1.3 million] award ... ."  (Appellee's Br. at 71-72.)

Because we agree with the District Court that the third guidepost set forth in the *Gore* and *Campbell* cases, i.e., the disparity between the punitive damages award and comparable civil penalties, is not instructive here, *see Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 468 (3d Cir. 1999) (finding third guidepost "unhelpful" in case involving tortious interference and related common law tort claims), our discussion is confined to the first two guideposts, namely the degree of reprehensibility and the disparity between the harm and the award.

### A. Degree of Reprehensibility

The Supreme Court has recognized that the degree of reprehensibility of the defendant's conduct is "[t]he most important indicium of the reasonableness of a punitive damages award." *Campbell*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575). In evaluating the degree of Sunrise's reprehensibility in this case, we must consider whether: "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.*

The District Court found that three of the five reprehensibility subfactors were present in this case: CGB was financially vulnerable; Sunrise's actions involved repeated misconduct; and Sunrise acted intentionally. We

11

agree with the District Court that the financial vulnerability subfactor weighs in favor of finding Sunrise's conduct reprehensible. CGB was a small company which operated out of Ms. Brillman's home and only employed approximately twenty therapists. At the time Tomes met with CGB's therapists, she knew that CGB was in a financially vulnerable position because RHA owed CGB $600,000 in back payments. She also knew that her successful recruitment of CGB's therapists would further decimate CGB's business.

We also agree with the District Court that Sunrise intentionally inflicted harm on CGB, which further increases the culpability of Sunrise's conduct. The evidence shows that Tomes met with CGB's therapists despite express warnings from both Brillman and Sunrise's own principal, RHA, not to do so. At the meeting, Tomes told the therapists that CGB's contracts with RHA had been terminated because CGB was unable to comply with Medicare changes and that CGB could not compete with Symphony, even though Brillman had told Tomes several times that CGB could, in fact, comply with the Medicare changes and Tomes otherwise had no reason to believe that CGB could not compete with Symphony. As a result of Tomes's misstatements, CGB's therapists began to fear for their jobs and distrust their employer, and they were thus more inclined to respond favorably to Tomes's recruitment efforts. Although Brillman quickly confronted Tomes about her misconduct, Tomes continued to assist Symphony in its recruitment of CGB's therapists, even providing Symphony with access to a conference room at the Prospect Park facility for the purpose of interviewing CGB's therapists. In sum, the evidence amply supports a finding that

12

Sunrise's conduct was intentionally harmful, rather than merely accidental.

In considering the "repeated conduct" subfactor of the reprehensibility analysis, the District Court observed that Sunrise's tortious conduct involved "repeated stalling and dishonesty" (JA at 12), and that Sunrise "continually refused to be held responsible for its actions, ignoring and rebuffing Plaintiff ... ." (JA at 9.)  Sunrise argues that the District Court applied this factor wrongly.  Relying on our statement in *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224 (3d Cir. 2005) that "[t]he 'repeated conduct' cited in *Gore* involved not merely a pattern of contemptible conduct within one extended transaction ..., but rather specific instances of similar conduct by the defendant in relation to other parties[,]" *id.* at 232, Sunrise contends that the "repeated conduct" subfactor is not satisfied here because there is no evidence that it committed similar tortious acts against other entities.

Contrary to Sunrise's suggestion, we did not hold in *Willow Inn* that the "repeated conduct" inquiry is so limited in scope.  We instead recognized that, while the "repeated conduct" subfactor will necessarily have "less force" where the defendant's misconduct did not extend beyond his dealings with the plaintiff , *id.* at 232-33, it may still be "relevant" in measuring the reprehensibility of the

13

defendant's conduct, based on the particular facts and circumstances presented.[3]  *Id.* at 232-33.

"[E]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful" is highly indicative of reprehensibility.  *Gore*, 517 U.S. at 576.  In this case, within days of meeting with CGB's therapists over the protestations of both RHA and CGB,

_____

[3] Sunrise alternatively argues that the facts and circumstances of this case are distinguishable from those before us in *Willow Inn*.  In *Willow Inn*, the defendant-insurer employed various stonewalling tactics in processing the plaintiff-insured's property damage claim.  We determined that the defendant's misconduct was probative of reprehensibility because it "suggest[ed] that [the defendant's] actions were designed to achieve a fiscally beneficial result for itself at odds with the Pennsylvania Supreme Court's long-time dictate that an insurer must act with the utmost good faith toward its insured."  *Id.* at 233 (citation and internal quotation marks omitted).  Sunrise reads *Willow Inn* to hold that a pattern of misconduct by the tortfeasor within a single transaction is only relevant under the repeated conduct subfactor if the tortfeasor owed a fiduciary duty to the victim.  Contrary to Sunrise's assertion, *Willow Inn* imposes no such a limitation, and for good reason.  Repeated misconduct is probative of reprehensibility when the tortfeasor knows or suspects that his pattern of behavior is unlawful, regardless of whether that knowledge stems from a special legal relationship with the victim.  While the weight to be given the factor may vary, its relevance remains.

14

Tomes received a letter from CGB's counsel suggesting that her actions "appear[ed]" to constitute tortious interference. (JA at 461.) Despite thereby having reason to believe that her previous contact with CGB's therapists may have been unlawful, Tomes nevertheless continued to assist Symphony in recruiting the therapists. She thus evinced not only an intent to damage CGB but a willingness to act repeatedly on that intent, with utter contempt for CGB's interests and disregard for the law. We therefore believe that "the *Gore/Campbell* 'repeated conduct' subfactor applies to this case in a way not captured in the 'intent' subfactor." *Willow Inn*, 399 F.3d at 233.

While three of the five reprehensibility subfactors support, to varying degrees, the award of substantial punitive damages in this case, our consideration of the remaining two subfactors counsels against the need for such a high award. The harm suffered by CGB was economic, not physical, and Sunrise's tortious conduct did not demonstrate an indifference to or a reckless disregard of the health or safety of others. We have previously recognized that economic torts are "less worthy of large punitive damages awards than torts inflicting injuries to health or safety." *Inter Med.*, 181 F.3d at 467 (citation omitted). Based on our consideration of the reprehensibility guidepost, it appears that Sunrise's conduct was not sufficiently egregious to warrant a punitive damages award of $2 million. That conclusion is reinforced by our analysis of the second *Gore/Campbell* guidepost, i.e., the disparity between the punitive damages award and the harm suffered by the plaintiff.

15

### B. Ratio of Punitive Damages to Harm

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580. The Supreme Court has been "reluctant to identify concrete constitutional limits on the ratio," instead emphasizing that "[t]he precise award in any case ... must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Campbell*, 538 U.S. at 424-425. It has cautioned, however, that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425.

Measuring the $2 million punitive damages award against the $109,000 compensatory award in this case yields a double-digit ratio of over 18:1, which immediately "alerts the court[] to the need for special justification." *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 799 (8th Cir. 2004). The District Court opined that the ratio it permitted, which it characterized as "roughly 19:1," was not constitutionally excessive because of "the facts of this case (including the wealth of Defendant and the state's interest in punishment and deterrence)." (JA at 14.) The District Court also sought to justify the high ratio by saying it "suspect[ed]" that "given the hardships Defendant imposed on Plaintiff in its treatment of Plaintiff after the interference took place, and given Defendant's antics leading up to the first trial, the true ratio, could [the full extent of] the harm caused by Defendant be

16

expressed as a simple dollar value, would be closer to three to one." *Id.*

The District Court's "true ratio" justification cannot withstand scrutiny. The Court effectively lowered the ratio by inflating the denominator based on suspicions of unquantified harm. We do not doubt that the District Court had reason to believe that some unquantified harm inflicted by Sunrise supports a substantial punitive damages award to CGB. But suspicions and speculation alone will not suffice. We need not reach the question of whether unquantified harm can ever affect the denominator in a punitive damages-to-actual harm ratio. It is enough to say that it does not affect it in this case. The District Court did not point to evidence in the record, nor did it articulate its reasoning for concluding that the denominator ought to be something other than what the first jury expressly held in its compensatory damages verdict was the actual harm. With no evidence or articulated reason to support the framing of a different denominator, the $109,000 compensatory award is the appropriate denominator under the *Gore/Campbell* ratio analysis.[4]

---

[4] This is not to say that the ratio's denominator should in all cases be limited to the amount of compensatory damages awarded by the jury. *See, e.g.*, *Willow Inn*, 399 F.3d at 234-37 (measuring $150,000 punitive damages award against $135,000 award in attorney fees and costs, rather than against $2,000 compensatory award); *Continental Trend Resources, Inc. v. OXY USA Inc.*, 101 F.3d 634, 640 (10th Cir. 1996) (considering expert testimony of potential loss to plaintiffs in the amount of $769,895, in addition to

Heeding the Supreme Court's admonition that few awards exceeding the single-digit threshold will satisfy due process, we conclude that the 18:1 ratio in this case crosses the line into constitutional impropriety. *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 24 (1991). While the reprehensibility of Sunrise's conduct and the harm it inflicted on CGB should not be minimized, there are no special circumstances justifying the enormous disparity between the punitive damages award and the compensatory damages recovered by CGB in this case. The Supreme Court has suggested that greater ratios may comport with due process in cases where "a particularly egregious act has resulted in only a small amount of economic damages," or where "the injury is hard to detect or monetary value of noneconomic harm might have been difficult to determine." *Campbell*, 538 U.S. at 425 (quoting *Gore*, 517 U.S. at 582); *see Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1273 (10th Cir. 2000) ("[W]here the injury is primarily personal, a greater ratio may be appropriate."). But this is not such a case. In short, a further reduction of the $2 million award is required, in light of our consideration of the *Gore/Campbell* guideposts.

### III.

As we stand in the "role as gatekeeper in reviewing an award of punitive damages[,]" *Inter Med.*, 181 F.3d at 468,

---

compensatory damages awarded for past harm, as part of ratio's denominator). We only conclude that District Court was not free to arbitrarily quantify the value of any uncompensated harm suffered by CGB for purposes of setting the ratio's denominator.

18

we turn next to our responsibility for determining the constitutional limit on the award in this case. *See id.* ("[A]n appellate panel, convinced that it must reduce an award of punitive damages, must rely on its combined experience and judgment."). In making this determination, we must accord "a measure of deference" to the jury's award. *Willow Inn*, 399 F.3d at 231. We are obliged to "decrease the award to an amount the evidence will bear, which amount must necessarily be as high - and may well be higher - than the level the court would have deemed appropriate if working on a clean slate." *Id.* (citing *Dunn v. HOVIC*, 1 F.3d 1371, 1381 (3d Cir. 1993) (en banc)). After carefully reviewing the record and the parties' arguments, we conclude that a punitive damages award in the amount of $750,000 represents the constitutional upper limit in this case.

A punitive award of $750,000 bears a reasonable relationship to the reprehensibility of Sunrise's tortious conduct and results in a punitive damages-to-harm ratio of less than 7:1, within the single-digit range, as counseled by the Supreme Court. In arriving at this figure, we have also considered the evidence of Sunrise's financial strength, which the jury was appropriately permitted to take into consideration, recognizing that what "may be awesome punishment for an impecunious individual defendant ... [may be] wholly insufficient to influence the behavior of a prosperous corporation." *Continental Trend*, 101 F.3d at 641; *see Campbell*, 538 U.S. at 427-28 (observing that consideration of defendant's wealth is not "unlawful or inappropriate" so long as it is not used to "make up for the failure of other factors, such as 'reprehensibility,' to constrain

19

significantly an award that purports to punish a defendant's conduct") (citation omitted).

Wealth is also relevant because "[a] rich defendant may act oppressively and force or prolong litigation simply because it can afford to do so and a plaintiff may not be able to bear the costs and the delay." *Continental Trend*, 101 F.3d at 642; *accord Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) (Posner, J.) ("[W]ealth in the sense of resources ... enable[s] the defendant to mount an extremely aggressive defense against suits such as this and by doing so to make litigating against it very costly ... . In other words, the defendant is investing in developing a reputation intended to deter plaintiffs."). Informed by many decades of experience as a trial judge and by the specific experience of presiding over several years of pretrial proceedings and two trials in this matter, the District Court Judge described Sunrise's litigation conduct as "tell[ing] a tale of repeated stalling and dishonesty" (JA at 12), which included the imposition of "countless obstacles to rapid resolution of Plaintiff's claims" (*id.* at 9), among other "antics." (*Id.* at 14.) Brillman testified about Sunrise's abusive and dilatory litigation tactics (JA at 156-61), including Sunrise's initiation of meritless collateral proceedings against CGB in RHA's bankruptcy case,[5] and "constant[]" threats from Sunrise to

_____

[5]According to CGB, the Bankruptcy Court described Sunrise's claim as a "Machiavellian scheme" intended to deprive CGB of a legitimate payment. (CGB Reply Br. at 11-12.)

20

"keep litigation [going] forever." (JA at 167.)[6] Brillman demonstrated tremendous fortitude. She took out a second mortgage on her home and vowed to litigate CGB's claims to final resolution (JA at 166-67), but litigants should not have to face something akin to medieval trial by combat to resolve a basic business dispute. The mounting costs of this drawn-out, no-holds-barred litigation might have forced many a small business to accept an undervalued settlement or to abandon its claims altogether. Indeed, the case history here strongly implies that Sunrise had exactly that outcome in mind.

This was not, it should be emphasized, simply a hard-fought case. No litigant, whether its resources are great or small, is required to "make nice" by giving up legitimate legal positions. What sets this case apart and makes it, we hope, truly unusual is the repeated use of procedural devices to

---

[6]One of Sunrise's claims of error on the first appeal was that the District Court abused its discretion in denying Sunrise's request for a continuance, on the second day of trial, due to Tomes's unavailability to testify. The District Court noted that it had ordered Tomes to be available to testify on an earlier date, before she became unavailable, but that Sunrise failed to produce her without explanation. The District Court concluded that Sunrise's continuance request was "clearly the product of bad planning and, mostly likely, bad faith," and we upheld that ruling. *CGB I*, 357 F. 3d at 391. On remand, the second jury was made aware of Tomes's failure to attend the first trial on the date ordered. (JA at 353-59.)

21

grind an opponent down, without regard for whether those devices advanced any legitimate interest. The District Court Judge, the Bankruptcy Judge who waded through the meritless adversary action, and a previous panel of this Court have all, to one degree or another, commented negatively on Sunrise's litigation tactics.[7] Under these literally remarkable circumstances, a substantial punitive damages award is warranted to prevent Sunrise from gaining the unfair advantage of a reputation for bleeding legal adversaries to death before they can vindicate their rights. *Mathias*, 347

---

[7]We would ordinarily rather see parties and district courts deal directly with litigation misconduct by the statutory and procedural mechanisms set up for that purpose, *see, e.g.*, 28 U.S.C. § 1927; Fed. R. Civ. P. 11, than to see frustration at such misconduct take the form of a punitive damages ruling subject only to constitutional review. As already noted, however, evidence of litigation misconduct can support an award of punitive damages, and, in this case, we do not face the very real concerns that would arise if a trial were diverted from the merits and converted into bickering about litigation tactics. Jurors typically are not well-positioned to sort out discovery questions that can vex even talented and well-meaning members of the bench and bar, but the concerns about misconduct that inform our decision today are largely founded on comments from the judicial officers who were required to ride herd on the various phases of this case. To the extent evidence of misconduct was presented to the jury in this case, Sunrise has chosen not to challenge the District Court's evidentiary rulings on appeal. (*See* Appellant's Br. at 11.)

F.3d at 677.  There is a cost to abusive litigation tactics, and Sunrise will pay it, at least to a degree.  While the punitive damages award here represents far more than litigation misconduct, that misconduct is relevant to our analysis.

In further considering the reasonableness of a reduced award in the amount of $750,000, we find it significant that Sunrise, in its first appeal, did not challenge the constitutionality of the $1.3 million punitive damages verdict that the first jury returned.  Even considering that the $1.3 million punitive award was based on two verdicts for tortious interference, one of which was subsequently overturned on appeal, we think Sunrise's past silence leaves it hard-pressed to argue that the imposition of a six-figure penalty on the surviving claim of tortious interference is grossly excessive.

In sum, we conclude that the maximum constitutionally permissible punitive award in this case is $750,000.

## IV.

Punitive damages awards are "the product of numerous, and sometimes intangible, factors ... .  Because no two cases are truly identical, meaningful comparisons of such awards are difficult to make."  *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 457 (1993) (plurality opinion).  We expect that will remain true of this abnormally contentious case.  For the foregoing reasons, we will vacate the District Court's punitive damages award and remand this case with instructions to enter a new judgment for punitive

23

damages in the amount of $750,000. CGB's cross-appeal is
dismissed.


*CGB Occupational Therapy, Inc. v. RHA Health Service, Inc.*
Nos. 05-3409, 05-3586

ROTH, <u>Circuit Judge</u>, dissenting:

> *'It seems a shame,' the Walrus said,*
> *'To play them such a trick,*
> *After we've brought them out so far,*
> *And made them trot so quick!'*

Lewis Carroll, *Through the Looking-Glass*

This case was botched on remand. A litigant appealed to
our Court and won a partial reversal, and yet the judicial system
left that litigant worse off on remand than it had been before it
appealed. The proceedings before the District Court simply did
not comport with the mandate we had issued. For that reason
alone, the judgment of the District Court should be vacated, and
this case should be remanded for proceedings consistent with
our original mandate. We need not, and therefore should not,
reach the constitutional question of whether the remitted
punitive award was so excessive as to violate the Due Process
Clause of the Fourteenth Amendment. I therefore do not join
my colleagues in answering a question that should not be before
us, and so I respectfully dissent.

I.

24

The first jury found in favor of CGB Occupational Therapy, Inc., having determined that the defendants, Sunrise Assisted Living Management, Inc. and Sunrise Assisted Living, Inc. (collectively, Sunrise), tortiously interfered with CGB's contracts with two nursing home facilities and its own therapists. The jury awarded CGB $576,000 in compensatory damages for Sunrise's interference with the nursing home contracts, $109,000 in compensatory damages for Sunrise's interference with CGB's therapist contracts, and $1.3 million in punitive damages. It was not clear how the jury allocated the punitive damages award between the two acts of interference, because the verdict form did not specify. *See CGB Occupational Therapy, Inc. v. RHA Health Serv., Inc.*, 357 F.3d 375, 382 (3d Cir. 2004).

A panel of our Court considered this case and concluded that, as a matter of law, Sunrise was entitled to judgment in its favor on the claim of tortious interference with the nursing home contracts. *Id.* at 385-88. We allowed the judgment to stand on the other claim of tortious interference, regarding the therapist contracts. *Id.* at 389-90. The effect of our holding on compensatory damages was simple: CGB retained the $109,000 award on the affirmed claim, but lost the $576,000 award on the reversed claim. The award of punitive damages posed a thornier question because we had no way to know what part, if any, of the $1.3 million punitive award was intended by the jury to punish Sunrise for action underlying the claim we had reversed. In recognizance of this difficulty, we wrote:

> [I]t is impossible to determine how punitive damages should be allocated in light of our

determination that Sunrise could not have interfered with the contract between CGB and RHA/Pennsylvania. Consequently, we must reverse the punitive damage determination and remand to the District Court for a redetermination of punitive damages in accordance with this opinion.

*Id.* at 390. On remand, the sole task for the District Court was to be a redetermination of punitive damages. Had we been able to apportion the punitive award then, we would not be here today.

The District Court found our mandate for the remand to be unclear. The court ruled that although "[t]he Third Circuit ruling in this case has not, unfortunately, completely illuminated the path that this Court must take[,] . . . [t]his Court's reading of the Third Circuit's mandate is that the entire issue of punitive damages, including whether or not they are appropriate given Defendants' conduct, must be retried." Order of December 29, 2004. The District Court went on to hold that Sunrise was entitled to argue that its conduct was not "sufficiently grievous as to justify an award of punitive damages," but that it could not argue that its conduct was not wrongful or tortious because our Court had affirmed the first jury's finding that the conduct was tortious. Under this ruling, the second jury was to consider whether punitive damages should be awarded based on Sunrise's tortious interference with CGB's therapist contracts, and the jury was free to award any punitive award it saw fit, from zero to infinity, subject to review for excessiveness.

26

At the end of the second trial, the jury considered the issue of punitive damages and returned with the punitive award that it saw fit: $30 million. The District Court determined that this award was excessive and reduced it to $2 million. Needless to say, neither the jury's award nor the court's remittitur reflects an attempt to apportion the first jury's punitive award of $1.3 million.

## II.

A longstanding and central principle of our judicial system is that "an inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pa. R.R. Co.*, 334 U.S. 304, 306 (1948). *See also Casey v. Planned Parenthood of Se. Pa.*, 14 F.3d 848, 856 (3d Cir. 1994). Where a reviewing court in its mandate states that the trial court must proceed in accordance with the opinion of the reviewing court, that opinion becomes a fully-merged part of the mandate. *See Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985) (quoting *Noel v. United Aircraft Corp.,* 359 F.2d 671, 674 (3d Cir. 1966)). Once the mandate is issued, "[a] trial court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Bankers Trust*, 761 F.2d at 949. The question we must answer is whether the District Court violated the letter or the spirit of our Court's mandate, looking for guidance at the entirety of our opinion, which we expressly stated to be part of our mandate.

By our Court's express language, the punitive award was reversed, and the case was remanded for a "redetermination" of

27

punitive damages. The judgment was silent as to whether the range of punitive awards available on remand would be limited by the award determination of the first jury. The District Court interpreted our silence as lack of direction and proceeded to decide that the range was open. If we did not settle this issue on the first appeal, then the District Court acted properly, as a trial court on remand "is free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not settled by the decision." *Casey*, 14 F.3d at 857 (quoting *Bankers Trust*, 761 F.2d at 950) (internal quotation marks omitted).

The express language of the mandate was not, however, the entirety of what the District Court should have considered. As we explained in *Bankers Trust*, when a district court executes a mandate issued by our Court, it must seek guidance not only in the letter of mandate, but in its spirit, and it must look both to the opinion and to the circumstances it embraces. 761 F.2d at 949.

What it means to follow the "spirit" of a mandate, however, is uncomfortably ambiguous. When we remand a case for further proceedings, we of course cannot expect the court to do what we mean, even when what we mean cannot reasonably be understood from what we say. We do, however, expect that the court will implement faithfully the mandate it receives. When a case is remanded for a limited purpose, faithful implementation of the mandate means that the district court will narrowly tailor the proceedings to ensure that the proceedings do not enlarge themselves beyond their narrowly mandated scope, as they are wont to do. Faithful implementation of a mandate is

28

often more art than science, and considerable discretion is owed to the district court. This discretion, of course, has outer limits, and at least one of those limits should be clear: When the proceedings on remand result in an outcome that is grossly incongruous with the purpose for which the remand was ordered, the spirit of the mandate is violated.

The purpose of our mandate in this case was clear. The District Court had ordered Sunrise to pay compensatory and punitive damages totaling $1,985,000, and Sunrise appealed the judgment against it. We partially reversed the judgment and therefore needed to reduce the $1,985,000 award. We struck the $576,000 compensatory award, and sought to do the same to a portion of the $1.3 million punitive award. In other words, the punitive award needed to be reduced, and we ordered a redetermination of punitive damages because, although we knew that the original punitive award was too high, we did not know by how much. Instead, the redetermination resulted in an *enlargement* of the punitive award, to a figure that was higher than the original punitive and compensatory awards together. The procedural history can be reduced to this: The District Court used the remand we had ordered to nullify the effect of our holding and place Sunrise in a worse position than it had been before it won its appeal. The spirit of our mandate was violated.

In a just legal system, such a result should not be tolerated. If a victorious appellant is to be rewarded with a higher award against it, then we as judges are little better than the Walrus and the Carpenter, who beseech the Oysters to walk with them, only to reward the Oysters by eating them. *See*

29

LEWIS CARROLL, *Through the Looking-Glass and what Alice found there*, *in* THE COMPLETE WORKS OF LEWIS CARROLL 133, 185-88 (Vintage Books 1976) (1871). Litigants in federal court deserve better treatment than that.[8]

III.

"A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n* 485 U.S. 439, 445 (1988). The majority decides this case under the Due Process Clause of the Fourteenth Amendment. I recognize that the law on this subject is not clear and that litigants in our circuit would benefit from what guidance they can receive from our Court. The role of the court of appeals, however, is not to provide guidance whenever we believe it will be helpful. Our job is to decide cases, and the case before us today does not raise a constitutional question. Had the District Court adhered to the spirit of our mandate, the $2 million punitive award that the

---

[8]Judge McConnell recently has voiced similar concerns in the context of criminal resentencing, where sometimes a defendant successfully challenges his or her sentence and nonetheless faces an "appeal tax" in the form of a higher sentence. *See United States v. Medley*, 476 F.3d 835, 840-43 (10th Cir. 2007) (McConnell, J., concurring). I express no view as to whether appellants in some circumstances must risk unfavorable outcomes as a result of their success on appeal. Our mandate in this case, however, should not have placed Sunrise in such a dilemma, and because the proceedings on remand did so, they undermined our holding.

majority considers never would have issued.  I would ask the District Court to correct the error, not use the error as a springboard to constitutional analysis.

The judgment of the District Court should be vacated as to punitive damages and remanded with an explanation of what our original mandate required.  Punitive damages should be capped at $1.3 million, the maximum amount attributable to Sunrise's interference with the therapist contracts under the first jury's award.

I respectfully dissent.

31