PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-3114 & 18-3197
_____

MICHAEL JESTER; PENN RIDGE FARMS, LLC
                              Appellants in No. 18-3197

v.

ROBERT HUTT; FANTASY LANE THOROUGHBRED
RACING STABLE, LLC; FANTASY LANE
THOROUGHBREDS; FANTASY LANE STABLE INC.,
                              Appellants in No. 18-3114
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-15-cv-00205)
District Judge: Honorable Yvette Kane
_____

Argued June 13, 2019
Before: HARDIMAN, PORTER, and COWEN, *Circuit Judges*.

(Opinion Filed:  August 28, 2019)

Gordon A. Einhorn
Thomas Thomas & Hafer
305 North Front Street, 6th Floor
Harrisburg, PA 17101
        *Attorney for Appellants in No. 18-3114*

Mark D. Bradshaw
Stevens & Lee
17 North Second Street, 16th Floor
Harrisburg, PA 17101
        *Attorney for Appellants in No. 18-3197*

——————————

OPINION OF THE COURT
——————————

HARDIMAN, *Circuit Judge*.

This case comes to us following a jury verdict in favor of Penn Ridge Farms, LLC and against Fantasy Lane Thoroughbred Racing Stable, LLC. The jury awarded Penn Ridge $110,000 on its contract claim, $1 in nominal damages on its defamation claim, and $89,999 in punitive damages. The District Court reduced the punitive damages award to $5,500. Fantasy Lane asserted counterclaims for negligence, breach of contract, and breach of fiduciary duty, but was unsuccessful on each. Fantasy Lane appealed, seeking reversal of certain adverse rulings before and after the trial. Penn Ridge responded with a cross-appeal asking us to reinstate the full punitive damages award.

# I

Penn Ridge is a horse boarding and breeding facility near Harrisburg, Pennsylvania. Penn Ridge agreed to board several of Fantasy Lane's horses starting in July 2012, including its thoroughbred stallion Uptowncharlybrown. The agreement obligated Penn Ridge to "act as Fantasy Lane's agent for the promotion and management of Uptowncharlybrown's stallion seasons, and . . . exercise its utmost good faith to promote, manage[,] and sell Uptowncharlybrown stallion seasons . . . ." App. 721. Penn Ridge also agreed to keep several of its own mares at the facility to support Uptowncharlybrown.

Beginning in August of 2013, Fantasy Lane got behind on its payments due to Penn Ridge. And after some of its horses became sick or injured and even died, Fantasy Lane refused to pay Penn Ridge boarding invoices totaling $65,707. The managing partner of Fantasy Lane, Robert Hutt, sent several emails to others in the horse-breeding industry expressing his dissatisfaction with Penn Ridge owner Michael Jester and the treatment of Fantasy Lane's horses.

In the midst of this dispute, Hutt told Dr. Jeffrey Edelson—the veterinarian designated by Penn Ridge—that Fantasy Lane was considering suing him for his role in treating their horses. The two negotiated and entered into a "General Settlement and Release Agreement." *Michael Jester & Penn Ridge Farms, LLC v. Robert Hutt & Fantasy Lane Thoroughbred Racing Stable, LLC*, 2017 WL 1150648, at *2 (M.D. Pa. Mar. 28, 2017). The agreement released "any and all persons, firms, or corporations liable or who might be liable . . . [from liability] arising out of or in any way relating to any injuries and damages of any and every kind . . . [in] the

3

care and/or treatment of any [Fantasy Lane] horses stabled at Penn Ridge . . . ." *Id.* (alterations in original). The settlement and release resolved the conflict between Dr. Edelson and Fantasy Lane, but did nothing to dispel the acrimony between Fantasy Lane and Penn Ridge.

Penn Ridge sued Fantasy Lane in Pennsylvania state court for breach of contract and defamation. The contract claim was for nonpayment for boarding and breeding services provided to Fantasy Lane's horses. The tort claim alleged that Hutt sent several defamatory emails about Penn Ridge and Jester's competence, as well as the care given to horses stabled there, to several individuals in the industry who had an interest or prospective interest in Fantasy Lane. Hutt blamed Penn Ridge for the deaths of its horses, calling the staff "inexperienced," and expressing that he had "no faith" in them. App. 768. He accused Penn Ridge of trying to conceal the problems, noting that Jester's personality "was a cross of President Richard Nixon, and the character[] Jack Nicholson played in[] A Few Good Men" and that Jester was "the type of person that would say or do anything to save his ass." App. 786. Hutt also alleged that Jester told him "the truth" about one of the deaths—that Jester made the decision not to seek professional help or notify Fantasy Lane when Penn Ridge first discovered the horse was ill. App. 787–88. He also claimed Jester "was responsible for killing [the] horse and he deliberately[,] like Nixon[,] was the leader of the coverup [*sic*]." App. 788.

Fantasy Lane removed the case to the District Court based on diversity of citizenship. In answering Penn Ridge's amended complaint, Fantasy Lane brought counterclaims, including four negligence claims for the poor care and

4

mistreatment of its horses, a breach of contract claim for the promotion and management of Uptowncharlybrown, and a breach of fiduciary duty claim stemming from the stallion season issues. Penn Ridge moved for partial summary judgment, and the District Court granted the motion on the negligence counterclaims, holding that the agreement between Fantasy Lane and Dr. Edelson released all other parties who might be liable for injuries to Fantasy Lane's horses while boarded at Penn Ridge.

The remaining claims (breach of contract and defamation asserted by Penn Ridge and breach of contract and breach of fiduciary duty asserted by Fantasy Lane) were tried to a jury. After a three-day trial, the jury found for Penn Ridge, awarding it $110,000 for the breach of contract damages, $1 in nominal damages on its defamation claim, and $89,999 in punitive damages. The jury found against Fantasy Lane on its contract and fiduciary duty claims.

Fantasy Lane filed a motion for a new trial or remittitur or, in the alternative, to alter or amend the judgment under Rules 59(a) and 59(e). The motion was granted in part and denied in part. The District Court found the punitive damages award unconstitutionally excessive under *BMW of North America v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), and reduced it to $5,500. In the District Court's opinion, this amount was "reasonable and proportionate to the harm suffered by [Penn Ridge] and conform[ed] to the requirements of the due process clause." *Jester v. Hutt*, 2018 WL 4110625, at *7 (M.D. Pa. Aug. 29, 2018). But the Court declined to grant Fantasy Lane a new trial or reduce the contract damages award. Fantasy Lane appealed the Court's partial summary judgment and partial denial of its post-trial motion. Penn Ridge cross-

5

appealed the Court's order reducing the punitive damages for defamation.

## II

The District Court had jurisdiction under 28 U.S.C. § 1332(a)(1). We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a summary judgment, and we apply the same standard as the District Court. *E.g., Watson v. Abington Twp.*, 478 F.3d 144, 155 (3d Cir. 2007). We review for abuse of discretion an order denying a motion for a new trial under Rule 59, *City Select Auto Sales Inc. v. David Randall Assocs., Inc.*, 885 F.3d 154, 163 (3d Cir. 2018), and a District Court's ruling on a motion requesting remittitur, *William A. Graham Co. v. Haughey*, 646 F.3d 138, 142 (3d Cir. 2011). We review de novo "a trial court's constitutionally required reduction of damages." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 716–17 (3d Cir. 2010).

## III

### A

We first consider Fantasy Lane's contention that its negligence counterclaims were not amenable to summary judgment. The District Court relied on the general release Hutt signed (on behalf of Fantasy Lane) with Dr. Edelson, which released "any and all persons, firms, or corporations liable or who might be liable . . . [from liability] arising out of or in any way relating to any injuries and damages of any and every kind . . . [in] the care and/or treatment of any [Fantasy Lane] horses stabled at Penn Ridge . . . ." *Jester*, 2017 WL 1150648, at *2 (alterations in original). According to Fantasy Lane, Dr. Edelson obtained the release by falsely representing that his

6

attorney made only technical changes to the prior draft. And in reliance upon that representation, Hutt failed to read the revised settlement agreement and release.

Under Pennsylvania law, "[i]t is well established that, in the absence of fraud, the failure to read a contract before signing it is 'an unavailing excuse or defense and cannot justify an avoidance, modification[,] or nullification of the contract'; it is considered 'supine negligence.'" *Germantown Sav. Bank v. Talacki*, 657 A.2d 1285, 1289 (Pa. Super. Ct. 1995) (quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 & n.* (Pa. 1983)). To show fraud, one must establish by clear and convincing evidence: "(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result." *Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Invs.*, 951 F.2d 1399, 1409 (3d Cir. 1991) (quoting *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1252 (Pa. Super. Ct. 1983)).

Even if Dr. Edelson misrepresented the changes to induce Hutt's acquiescence, Hutt's reliance on those misrepresentations in lieu of reading the settlement agreement and release was not justifiable. As the District Court noted, Hutt had a chance to review the changes to the previous draft, which increased the length of the agreement from about one to three pages. This increase should have alerted Hutt that the revisions were meaningful. Nothing stopped Hutt from reading the short release, and the provision in question was not hidden or confusing. The language appeared on the second page in the key section discharging Dr. Edelson from liability, which was the very purpose of the release.

7

Fantasy Lane now insists Hutt's averment in his sworn declaration that he lacks legal expertise creates a genuine issue of material fact which precluded the District Court from determining that it was unreasonable for Hutt—a "legally sophisticated former claims manager"—to rely on Dr. Edelson's representation. *Jester*, 2017 WL 1150648, at *7. But Hutt's stated lack of legal expertise provides no legal excuse for his failure to read the release. *See Germantown Sav. Bank*, 657 A.2d at 1289. To absolve a party from reading a settlement agreement and release—especially a simple one spanning three pages—would do violence to the law of contract. *See Standard Venetian Blind Co.*, 469 A.2d at 305–06 (explaining that allowing a party to "avoid application of the clear and unambiguous policy limitations" in an insurance contract because he did not read it would "require [the court] to rewrite the parties' written contract"). Because Fantasy Lane has not shown Hutt justifiably relied on Dr. Edelson's representations about the contract, it cannot claim fraud as an excuse for Hutt's failure to scrutinize the agreement. *See Mellon Bank Corp.*, 951 F.2d at 1409.

In sum, the clear language of the settlement agreement and release precludes Fantasy Lane from pursuing negligence claims related to the care of its horses. For that reason, the District Court did not err in granting partial summary judgment for Penn Ridge.

B

We next consider Fantasy Lane's argument that the District Court should have granted its motion for a new trial on the parties' respective contract claims.

8

To prevail, Fantasy Lane must show that "(1) the jury reached an unreasonable result, and (2) the District Court abused its broad discretion in not setting the verdict aside." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016). This is a high bar. A District Court should overturn a jury verdict only when "the 'great weight' of the evidence cuts against the verdict and 'where a miscarriage of justice would result if the verdict were to stand.'" *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996) (en banc)).

Fantasy Lane contends the jury's verdict for Penn Ridge on the contract dispute was "against the clear weight of the evidence." Fantasy Lane Br. 27. The basis for this argument is Fantasy Lane's insistence that Penn Ridge breached the agreement first. Fantasy Lane points to testimony from two people who were interested in breeding their mares to Uptowncharlybrown—one in the fall of 2012 and another in February 2013—but were either ignored or turned away by Penn Ridge. Because these incidents occurred before Fantasy Lane accrued a past-due balance for boarding services in August 2013, it claims the evidence shows Penn Ridge first breached the contract.

We agree with the District Court that the testimony just mentioned is insufficient to overturn the jury's verdict. The Court instructed the jury (as always) to evaluate the credibility of the witnesses testifying at trial. *See William A. Graham Co.*, 646 F.3d at 143. The mere fact that Fantasy Lane presented witness testimony supporting its counterclaim against Penn Ridge sheds no light on the credibility or weight the jury accorded such evidence. So it was no abuse of discretion to deny Fantasy Lane's motion for a new trial.

9

C

Fantasy Lane finally challenges as abuse of discretion that the District Court failed to reduce the jury's $110,000 compensatory award for contract damages.

Under Pennsylvania law, "[j]udicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant." *Zaukflik v. Pennsbury Sch. Dist.*, 104 A.3d 1096, 1129 (Pa. 2014) (alteration in original) (quoting *Haines v. Raven Arms*, 640 A.2d 367, 369 (Pa. 1994)). To make this determination courts consider "whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest the jury was influenced by partiality, prejudice, mistake, or corruption." *Id.* (quoting *Haines*, 640 A.2d at 369). The Pennsylvania Supreme Court has instructed that "[i]n reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence." *Ferrer v. Trs. of Univ. of Pa.*, 825 A.2d 591, 611 (Pa. 2002) (quoting *Delahanty*, 464 A.2d at 1257).

Fantasy Lane emphasizes that "no demand had been made or evidence presented for a figure exceeding" the total invoice amount of $65,707 for six months of boarding fees. Fantasy Lane Br. 28. Fantasy Lane does not dispute that evidence at trial showed the horses stayed at Penn Ridge for another four months after the last invoice. Rather, it contends the damages the jury apparently awarded to remunerate Penn Ridge for that period cannot stand because Penn Ridge neither asked the jury to award damages for those months nor presented evidence for "any actual charges incurred by Fantasy Lane after the last invoice was sent." *Id.*

10

Fantasy Lane claims the facts here are like those in *Steinhauer v. Wilson*, 485 A.2d 477 (Pa. Super. Ct. 1984). In that case, a Pennsylvania appellate court reduced the jury's compensatory award by $1,000 because the jury awarded the plaintiff $21,000 despite expert testimony that the cost of repairs were between $18,000 and $20,000 "without allowance for overhead or profit." *Steinhauer*, 485 A.2d at 479. Appellees argued it was reasonable to infer the jury included the extra $1,000 to cover additional costs. *Id.* The court disagreed, explaining that appellees presented no evidence to support the additional amount and that damages should be calculated with "reasonable certainty" rather than conjecture. *Id.* (quoting *Gordon v. Trovato*, 338 A.2d 653, 657 (Pa. Super. Ct. 1975)). Fantasy Lane insists the same logic should apply here, arguing that because the $110,000 award was based on "conjecture that an additional amount was owed and upon [the jury's] own conjecture of what that amount should be," the District Court abused its discretion in not reducing the award. Fantasy Lane Br. 31.

Fantasy Lane's argument has some force because the jury's decision to award more than the $65,707 stated on Penn Ridge's invoices is unusual. But unusual is not the same thing as excessive, and Fantasy Lane has not proved what is required to upend the jury's verdict. Here again, we agree with the District Court that "the verdict is not substantially larger than that which the evidence presented at trial could sustain." *Jester*, 2018 WL 4110625, at *4. The jury's award of $110,000 was not, as Fantasy Lane contends, based on conjecture about the costs of the four additional months of boarding costs. The record supports the inference that the jury extrapolated the monthly boarding fees (about $11,000) from the invoices in evidence to cover the entire ten-month period at issue.

Nor are we persuaded by Fantasy Lane's argument that this case is analogous to *Steinhauer*. The appellees there presented no evidence "tending to establish the [additional] amount of profit or overhead" awarded by the jury. *Steinhauer*, 485 A.2d at 479. Here, the jury had six months of invoices to extrapolate from, and it reasonably calculated the monthly costs for the additional four months based on the $65,707 six-month total. *See* App. 727–45. So we hold the District Court did not abuse its discretion in declining to reduce Penn Ridge's compensatory damages award.

D

Finally, we turn to Penn Ridge's challenge to the District Court's reduction of the punitive damage award for defamation from $89,999 to $5,500. The District Court found the award unconstitutionally excessive after evaluating it under the two guideposts established by the Supreme Court in *Gore* and reaffirmed in *State Farm*: "(1) the degree of reprehensibility of the defendant's misconduct" and "(2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award."[1] *State Farm*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 575).

The focus of this appeal is the District Court's application of the second guidepost. In considering *State*

---

[1] The third guidepost—"the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases"—is not instructive here for defamation, a common law tort. *See CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 190 (3d Cir. 2007).

*Farm*'s ratio guidance, the District Court recognized that "few awards exceeding a single-digit ratio between punitive and compensatory damage, to a significant degree, will satisfy due process." *Jester*, 2018 WL 4110625, at \*7 (quoting *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 192 (3d Cir. 2007)). And the Court noted that here, "the jury awarded punitive damages in an amount approximately 90,000 times the compensatory damage award of $1.00." *Id.* Because the Court determined in its reprehensibility analysis that Hutt's conduct "was not so sufficiently egregious to warrant" a nearly $90,000 punitive award, it concluded that an award of "$5,500.00 [was] reasonable and proportionate to the harm suffered by Plaintiffs and conforms to the requirements of the due process clause." *Id.* at \*6, \*7. So the Court reduced the punitive damage award accordingly.

We perceive two flaws in the District Court's analysis. First, as Penn Ridge noted, the District Court mischaracterized the $1 award as compensatory. The verdict form shows that award was nominal: under the "compensatory damages" line item (after the question on whether Penn Ridge proved "Hutt published a defamatory statement of and concerning [Fantasy Lane]"), the verdict form stated, "[i]f you find that Plaintiffs are not entitled to any compensatory damages, you must award Plaintiffs $1 in nominal damages." App. 872. Pennsylvania law does not, of course, treat nominal damages as synonymous with compensatory damages. *See Carter v. May Dep't Store Co.*, 853 A.2d 1037, 1041 (Pa. Super. Ct. 2004) (explaining that under the Restatement (Second) of Torts § 907, "[n]ominal damages are a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he

13

is entitled to compensatory damages"). So the Court's treatment of the $1 award as compensatory was incorrect.

The District Court also erred in comparing the $1 and $89,999 awards under the ratio guidepost. While the Court did not strictly follow the Supreme Court's single-digit guidance (which would have required a reduction of the $89,999 to $9 or less), *see State Farm*, 538 U.S. at 425, it cited this guidepost in its analysis reducing the punitive damages award.

But both *Gore* and *State Farm* strongly suggest that following this guidepost does not apply to nominal awards. The Supreme Court explained that the ratio guidepost compares punitive damages to the "actual harm inflicted on the plaintiff," *Gore*, 517 U.S. at 580, and that trial courts should consider the "ratio between punitive and compensatory damages," *State Farm*, 538 U.S. at 425. In view of that guidance, several of our sister courts have held that the single-digit ratio analysis does not apply to punitive awards accompanying nominal damages awards. *See Arizona v. ASARCO LLC*, 773 F.3d 1050, 1058 (9th Cir. 2014); *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 154 (4th Cir. 2008); *Patterson v. Balsamico*, 440 F.3d 104, 121 n.11 (2d Cir. 2006); *Romanski v. Detroit Entm't, LLC.*, 428 F.3d 629, 645 (6th Cir. 2005); *Williams v. Kaufman Cty.*, 352 F.3d 994, 1016 & n.76 (5th Cir. 2003); *cf. Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 528 (8th Cir. 2019) ("As in prior cases addressing nominal damages, we decline to place undue weight on the mathematical ratio between compensatory and punitive damages."). As the Fourth Circuit explained, "when a jury only awards nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount 'would utterly fail to serve the traditional purposes underlying an award of

14

punitive damages, which are to punish and deter.'" *Saunders*, 526 F.3d at 154 (quoting *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004)).

This approach to nominal awards is consistent with the Supreme Court's treatment of certain modest compensatory awards. *See Romanski*, 428 F.3d at 646. The Court explained in *Gore* that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582. And the Court noted that "[a] higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* This further suggests the ratio guidepost is inapt for nominal awards. *See Romanski*, 428 F.3d at 646. So we join our sister courts and hold that the single-digit ratio does not apply to nominal damage awards.

Without guidance from the ratio, how have courts evaluated the constitutionality of punitive damage awards? For starters, they have recognized that higher ratios between nominal and punitive awards "are to be expected." *Romanski*, 428 F.3d at 645; *see also Saunders*, 526 F.3d at 154; *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 126–27 (2d Cir. 2004); *Williams*, 352 F.3d at 1016. And after acknowledging that the punitive award can exceed the single-digit ratio, courts often "compare it to punitive awards examined by courts 'in [similar cases] to find limits and proportions.'" *Romanski*, 428 F.3d at 645 (quoting *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996)); *see, e.g.*, *Fabri*, 387 F.3d at 126–27 (comparing the punitive damages award to others in similar cases); *Williams*, 352 F.3d at 1016 n.78 (same); *see also Saunders*, 526 F.3d at 154 (comparing the punitive damages award "to other cases

involving similar claims" and assessing whether a lower award would act as a meaningful deterrent).

This approach accords with the Supreme Court's characterization of the ratio guidepost as providing an "indicium of an unreasonable or excessive punitive damages award." *Gore*, 517 U.S. at 580; *see Romanski*, 428 F.3d at 646 ("This approach is necessarily unscientific but aids us in identifying a ballpark within which to evaluate the [punitive damages] award at issue here."). In declining to adopt a "mathematical bright line between the constitutionally acceptable and . . . unacceptable" awards for the ratio guidepost, *Gore*, 517 U.S. at 583, the Court has explained that "a general concern of reasonableness properly enters into the constitutional calculus," *id.* (alterations omitted) (quoting *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 448 (1993)). Likewise, the Court described the reprehensibility analysis as "the most important indicium of the reasonableness of a punitive damages award." *Id.* at 575. So the Court's guideposts suggest that the touchstone for constitutional scrutiny of punitive damages awards is reasonableness. *See Willow Inn, Inc. v. Pub. Serv. Mut. Inc. Co.*, 399 F.3d 224, 231 (3d Cir. 2005). Because we believe that comparisons to punitive awards in similar cases will help district courts assess the reasonableness of a punitive award when only nominal damages are given, we too endorse this approach.

Because the District Court mischaracterized the nominal award as compensatory and erroneously applied the ratio guidepost, we will vacate the Court's order to the extent it reduces the punitive damages. In reevaluating the award on remand, the District Court should consider the reprehensibility of Hutt's conduct and compare the $89,999 award to those in defamation or other dignitary tort cases that do not involve

16

physical harm. We also note that while courts act as gatekeepers to review the constitutionality of punitive damages, "we must accord 'a measure of deference' to the jury's award." *CGB*, 499 F.3d at 193 (quoting *Willow Inn*, 399 F.3d at 231). When a court finds a jury's punitive award unconstitutional, it should "decrease the award to an amount the evidence will bear, which amount must necessarily be as high—and may well be higher—than the level the court would have deemed appropriate if working on a clean slate." *Id.* (quoting *Willow Inn*, 399 F.3d at 231). So if the District Court finds that the $89,999 punitive damages award is unconstitutionally excessive, it should explain why that amount is not within the range of reasonable punitive damages for this type of claim and why a lower award properly reflects the reprehensibility of Hutt's conduct.

\*     \*     \*

For the reasons stated, we will affirm the District Court's order granting partial summary judgment for Penn Ridge. We will also affirm the District Court's post-trial order to the extent it denies Fantasy Lane's motions for a new trial and reduction of the contract damages award, vacate that order's reduction of Penn Ridge's punitive damages award, and remand the case for further proceedings consistent with this opinion.

17