**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1867
_____

IN RE: GARTH F. LANSAW,
d/b/a Forever Young Childcare

DEBORAH LANSAW,
                                        Debtors


GARTH F. LANSAW and DEBORAH LANSAW

v.

FRANK ZOKAITES,
                                        Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2-15-cv-00404)
District Judge:  Honorable David S. Cercone
_____

Argued December 5, 2016

Before: FISHER,[*] KRAUSE and MELLOY,[**] *Circuit Judges.*

(Filed: April 10, 2017)

Jeffrey M. Robinson, Esq. **[ARGUED]**
Robinson Law Group
145 Lake Drive, Suite 102F
Wexford, PA 15090
        *Counsel for Appellant*

Warner Mariani, Esq. **[ARGUED]**
Warner Mariani, LLC
428 Forbes Avenue, Suite 555
Pittsburgh, PA 15219
        *Counsel for Appellees*

————

OPINION OF THE COURT

————

———————————

[*] Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.

[**] Honorable Michael J. Melloy, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

2

MELLOY, *Circuit Judge*.

The filing of a bankruptcy petition operates as an automatic stay of debt collection activities outside of bankruptcy proceedings. 11 U.S.C. § 362(a). If "an individual [is] injured by any willful violation of [the] stay," that individual "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." *Id.* § 362(k)(1). In the present case, Frank Zokaites committed several willful violations of the automatic stay arising from Garth and Deborah Lansaw's bankruptcy petition. Because of these violations, the Bankruptcy Court awarded the Lansaws emotional-distress damages as well as punitive damages under § 362(k)(1). The District Court affirmed the awards, and Zokaites now appeals. We conclude that § 362(k)(1) authorizes the award of emotional-distress damages and that the Lansaws presented sufficient evidence to support such an award. We also conclude that the Lansaws were properly awarded punitive damages. Accordingly, we will affirm.

**I.**

**A.**

The Lansaws operated a daycare in a space leased from Zokaites.[1] Over the course of several years, the relationship between the Lansaws and Zokaites devolved into

---

[1] Zokaites's appellate brief incorporates the facts stated in the Bankruptcy Court's memorandum opinion, *Lansaw v. Zokaites (In re Lansaw) ("Lansaw II")*, Ch. 7 Case No. 06-23936-TPA, Adv. No. 13-2037-TPA, 2015 WL 224093 (Bankr. W.D. Pa. Jan. 14, 2015). Our recitation of the facts borrows liberally from the Bankruptcy Court's opinion.

various disputes. The present dispute arose after the Lansaws entered into a new lease with a different landlord, but before they vacated Zokaites's property. When Zokaites learned of the new lease, he served the Lansaws with a Notice for Distraint, claiming a lien against the Lansaws' personal property for unpaid rent. The following day, August 16, 2006, the Lansaws filed for bankruptcy,[2] thereby triggering the automatic stay under 11 U.S.C. § 362(a). Zokaites's attorney was notified of the bankruptcy filing by a letter dated August 17, 2006.

Zokaites, nevertheless, violated the automatic stay in three separate incidents. First, on August 21, 2006, Zokaites and his attorney visited the Lansaws' daycare during business hours to take photographs of the Lansaws' personal property. Although Mrs. Lansaw initially denied Zokaites entry, Zokaites entered the daycare by following a daycare parent inside. Zokaites then entered Mrs. Lansaw's office and backed her against the wall, getting so close that she could feel his breath. During the incident, Zokaites asked Mrs. Lansaw three times in quick succession, "Do you want to hit me?"

Second, on Sunday, August 27, 2006, Zokaites visited the daycare after business hours and, this time, used his key to enter the building. He observed that the Lansaws had removed some personal property and plumbing fixtures from the space. Zokaites then padlocked and chained the doors. Mrs. Lansaw's mother, who had arrived to clean the daycare, attempted to stop Zokaites and called the police. A police

---

[2] The Lansaws initially filed for bankruptcy under Chapter 13, but the bankruptcy was later converted to Chapter 7.

officer, as well as the Lansaws, arrived at the daycare shortly thereafter. Zokaites suggested that Mrs. Lansaw inform the daycare parents that the daycare would not be open the next day. At the request of a police officer, he allowed Mrs. Lansaw to reenter the daycare and obtain the parents' contact information. Zokaites, however, insisted that Mrs. Lansaw be escorted in and out of the property by the officer.

After the Lansaws returned home, they received a call from their attorney informing them that Zokaites had left a proposed "interim standstill agreement" in the door of the daycare. It stated that Zokaites would not unchain the daycare doors unless (1) Mrs. Lansaw's mother agreed that she had not been assaulted by Zokaites, (2) the Lansaws reaffirmed their lease with Zokaites, and (3) the Lansaws ceased removing property from the daycare. The Lansaws informed their attorney that the agreement was not acceptable. They then returned to the daycare, removed the chains themselves, and decided to sleep in the building to prevent Zokaites from chaining the door again. Later that night, Zokaites also returned to the daycare. Before the Lansaws could reach the door, Zokaites removed Mrs. Lansaw's keys that had been hanging from the inside keyhole and locked the door from the outside. Zokaites left with the keys, which included personal keys in addition to the daycare keys, and returned to his vehicle. The Lansaws called the police once more.

Finally, on August 28, 2006, Zokaites directed his attorney to send a letter to the Lansaws' new landlord. The letter demanded that the new landlord terminate the Lansaws' new lease and stated that, if the lease was not terminated, Zokaites would file a complaint. A draft of that complaint was included with the letter. Zokaites's attorney also

5

admitted having multiple phone calls with the new landlord in an attempt to have the new lease terminated.

**B.**

For reasons that are unclear, the procedural history of the present action is somewhat complex and spans two separate adversary proceedings. The Lansaws first initiated an adversary proceeding in August 2006 to enjoin Zokaites from committing further violations of the stay. In the same proceeding, they also sought punitive damages, attorney fees, and other relief. After a trial, the Bankruptcy Court entered a December 2006 order finding that Zokaites had violated the stay and granting the Lansaws' request for an injunction. Although the Bankruptcy Court heard testimony related to emotional distress, it did not make a ruling on damages or attorney fees in its memorandum opinion. *See Lansaw v. Zokaites (In re Lansaw) ("Lansaw I")*, 358 B.R. 666, 672, 675 (Bankr. W.D. Pa. 2006).

The Lansaws again raised the issue of damages before the Bankruptcy Court in February 2007. This time, they did so in a counterclaim to Zokaites's proof of claim in the main bankruptcy case. This counterclaim for damages, however, also went unresolved. Approximately five years later, in December 2012, the main bankruptcy case was reassigned to the Honorable Thomas P. Agresti. After a status conference revealed that the counterclaim for damages was yet to be

6

settled, the Bankruptcy Court determined that the best way to resolve the issue was to initiate a new adversary proceeding. [3]

The new adversary proceeding, now before us in the present case, was tried in August 2014. At the outset of the trial, the Bankruptcy Court noted it was "building on" what the previous judge had already found in 2006, namely, that Zokaites had willfully violated the automatic stay. *Lansaw II*, 2015 WL 224093, at *3. The previous judge, however, had not made "definitive findings with regard to certain details of those violations," so the Bankruptcy Court again heard testimony regarding the violations. *Id.* at *13.

The Lansaws also presented evidence of emotional distress, which the Bankruptcy Court summarized as follows:

> The only evidence that the [Lansaws] presented as to emotional stress was their own testimony, though that was often compelling. Mrs. Lansaw testified that she continues to have

---

[3] As Judge Agresti noted, it is unclear why the damages claim went unresolved for so many years. Judge Agresti nonetheless determined that the damages issue remained open after reviewing the December 2006 opinion in conjunction with comments the previous judge made at a hearing in 2009. When appealing Judge Agresti's decision to the District Court, Zokaites argued that the omission of damages from the December 2006 opinion effectively denied the Lansaws' request for damages and that res judicata therefore applied. The District Court, however, held that the damages issue was not resolved prior to Judge Agresti's involvement and that res judicata did not apply. Zokaites does not challenge that determination in the present appeal.

nightmares about Zokaites entering the building and taking her business away. After these experiences she sometimes wakes up screaming and crying. She stated that when she is out in public and happens to see someone who looks like Zokaites she can experience moments of "sheer fear." She testified that she has lost trust in others and this has affected her relationship with friends. She is taking prescription medication for depression and an ulcer, conditions which she attributes to stress from Zokaites, beginning with [an incident prior to the stay violations] and continuing thereafter. She felt physically threatened when Zokaites entered her office on August 21, 2006, and backed her up to a wall. Mrs. Lansaw acknowledged that she has not sought psychological counseling, but said she is considering doing so.

Mr. Lansaw testified about the effects on his wife that he has observed. He said that she has changed markedly since the incidents involving Zokaites. She just goes to work and comes home, rarely going out in public, avoiding human contact, and not enjoying life. He testified to similar effects on himself, stating that he has become very withdrawn and has a fear of making new friendships. He testified that he has only one friend who understands what he has gone through and he has no one else to talk to about it.

8

*Id.* at \*7–8 (citations omitted). The Bankruptcy Court found this testimony credible and also noted that it was consistent with the previous judge's 2006 decision. The 2006 decision states that "Mrs. Lansaw was in tears in her various appearances before the Court and during her testimony." *Lansaw I*, 358 B.R. at 672.

The Bankruptcy Court found that Zokaites's stay violations caused the Lansaws at least some emotional distress. In so finding, the Bankruptcy Court considered the Lansaws' credible testimony, the egregious nature of Zokaites's violations, and the 2006 trial notes made and docketed by the previous judge. The Bankruptcy Court, however, acknowledged that factors other than Zokaites's stay violations also contributed to the Lansaws' emotional distress. As a result, the Bankruptcy Court "discounted" the actual damages award, *Lansaw II*, 2015 WL 224093, at \*10, ultimately awarding the Lansaws $7,500 for their emotional distress and $2,600 in attorney fees. The Bankruptcy Court also awarded the Lansaws $40,000 in punitive damages.

Zokaites appealed to the District Court, which affirmed. Zokaites filed this timely appeal.

## II.

The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157 and 1334; the District Court had jurisdiction under 28 U.S.C. § 158(a); and we have jurisdiction under 28 U.S.C. §§ 158(d)(1) and 1291. "Our review of the District Court's decision effectively amounts to review of the [B]ankruptcy [C]ourt's opinion in the first instance." *In re Allen*, 768 F.3d 274, 278–79 (3d Cir. 2014) (quoting *In re Hechinger Inv. Co. of Del.*, 298 F.3d 219, 224 (3d Cir. 2002)). We review the Bankruptcy Court's factual findings for clear error and its conclusions of law de novo. *Payne v. Lampe (In re Lampe)*, 665 F.3d 506, 513 (3d Cir. 2011). "A

9

finding of fact is clearly erroneous only if it is 'completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data.'" *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 92 (3d Cir. 2016) (quoting *Berg Chilling Sys., Inc. v. Hull Corp.*, 369 F.3d 745, 754 (3d Cir. 2004)). Finally, "[w]e review the constitutionality of the punitive damages award de novo, but we must accept any findings of fact . . . unless they are clearly erroneous." *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 189 (3d Cir. 2007).

## III.

Zokaites argues that the Lansaws introduced insufficient evidence to support an award of emotional-distress damages under 11 U.S.C. § 362(k)(1). That statute provides, with an exception not applicable here, that "an individual injured by any willful violation of a stay provided by this section shall recover *actual damages*, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1) (emphasis

added).[4]  Accordingly, as a threshold matter, we must first determine whether the term "actual damages" under § 362(k)(1) authorizes recovery for emotional distress. We conclude that it does, as discussed below. We then turn to whether the Lansaws presented sufficient evidence to support emotional-distress damages.

## A.

"Because the term 'actual damages' has [a] chameleon-like quality, we cannot rely on any all-purpose definition but must consider the particular context in which the term appears." *FAA v. Cooper*, 566 U.S. 284, 294 (2012). The term has been interpreted in some contexts to include

---

[4] On appeal, Zokaites does not concede, but also does not seriously contest, that he willfully violated the automatic stay. Even if we were to assume that this issue, determined in the 2006 decision, is properly before this Court, we would conclude the findings were not clearly erroneous. Zokaites's rationales for resorting to stay violations, including the advice of counsel, are immaterial to whether he violated the stay. *See Landsdale Family Rests., Inc. v. Weis Food Serv. (In re Landsdale Family Rests., Inc.)*, 977 F.2d 826, 829 (3d Cir. 1992) ("It is a willful violation of the automatic stay when a creditor violates the stay with knowledge that the bankruptcy petition has been filed. Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional. . . . [A] creditor's 'good faith' belief that he is not violating the automatic stay provision is not determinative of willfulness . . . ." (citation omitted)). *But see* 11 U.S.C. § 362(k)(2) (providing a "good faith" exception to § 362(k)(1) not applicable here).

11

damages for emotional distress and, in others, to only authorize damages for financial harm. *Id.* at 292–93 (collecting cases). This Court has not yet had occasion to address whether, in the context of § 362(k)(1), the term "actual damages" includes emotional-distress damages.

We do not, however, write upon a blank slate; Zokaites cites to numerous decisions by other courts considering the issue. Three circuits have expressly concluded that, under § 362(k)(1),[5] emotional-distress damages are available for willful violations of the automatic stay. *See Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1271 (11th Cir. 2014); *Dawson v. Washington Mut. Bank, F.A. (In re Dawson)*, 390 F.3d 1139, 1148 (9th Cir. 2004), *abrogation on other grounds recognized in Gugliuzza v. FTC (In re Gugliuzza)*, — F.3d —, 2017 WL 1101094, at *8–9 (9th Cir. Mar. 24, 2017); *Fleet Mortg. Grp., Inc. v. Kaneb*, 196 F.3d

---

[5] Section 362(k)(1) was previously codified at § 362(h). Most court decisions discussed in this opinion therefore cite to § 362(h). For our purposes, however, the statute's language remains the same, and we discuss and quote the prior court decisions as if they were decided under § 362(k)(1).

265, 269 (1st Cir. 1999).[6] Two circuits have left open the possibility that emotional-distress damages may be available in some circumstances. *See Young v. Repine (In re Repine)*, 536 F.3d 512, 522 (5th Cir. 2008); *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 880 (7th Cir. 2001). And one district court has rejected the notion that emotional-distress damages are available as "actual damages" under the statute. *See United States v. Harchar*, 331 B.R. 720, 732 (N.D. Ohio 2005). We consider three representative decisions in turn.

**1.**

In *Harchar*, the Northern District of Ohio noted that § 362(k)(1) "is indisputably an ambiguous statute with a dearth of legislative history." *Id.* The court further noted that § 362(k)(1) was not enacted with the automatic stay in 1978; rather, "[t]he 1978 Act provided no mechanism for enforcement of the automatic stay—perhaps due to [Congress's] expectation that enforcement would continue via procedures for contempt of court." *Id.* at 729. Indeed, prior to the automatic stay's codification in 1978, contempt was "the accepted procedure for enforcement of stay violations." *Id.*

The *Harchar* court noted, however, that questions surrounded the propriety of bankruptcy judges enforcing the

---

[6] In *Fleet Mortgage*, the First Circuit upheld an award of emotional-distress damages and explicitly stated that such damages are available under the statute. 196 F.3d at 269–70 ("[W]e note that emotional damages qualify as 'actual damages' under [§ 362(k)(1)]."). A later First Circuit decision nevertheless characterized *Fleet Mortgage*'s statement as dicta. *See United States v. Rivera Torres (In re Rivera Torres)*, 432 F.3d 20, 29 & n.10 (1st Cir. 2005).

automatic stay—now a creature of statute and not court order—through contempt procedures. *Id.* at 730 ("[R]eliance on contempt power to remedy violations of § 362 had been widely criticized." (quoting *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 422 (6th Cir. 2000))). Further, the court noted that the constitutional authority of bankruptcy judges to use contempt procedures was cast into doubt after the Supreme Court's 1982 decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982). *Harchar*, 331 B.R. at 730. The court inferred that these circumstances informed Congress's decision to enact § 362(k)(1) because the provision was enacted as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984.[7] *Id.* The court therefore concluded, "[T]here can be little doubt that when [§ 362(k)(1)] was enacted in 1984, Congress was concerned not with providing debtors compensation for emotional harms, but with providing explicit statutory authorization for the 'only previously available remedy for a stay violation: Contempt.'" *Id.* (quoting *In re Bivens*, 324 B.R. 39, 42 (Bankr. N.D. Ohio. 2004)). Additionally, the court stated, "There is little indication that awarding damages for emotional harm was

---

[7] In *Northern Pipeline*, the Supreme Court held that the Bankruptcy Act of 1978 unconstitutionally vested Article III judicial powers in "adjunct" bankruptcy courts. 458 U.S. at 86–87. The Bankruptcy Amendments and Federal Judgeship Act of 1984 was, at least in part, Congress's attempt to resolve these constitutional problems. *See* Pub. L. No. 98-353, 98 Stat. 333 (1984) (codified as amended in scattered sections of 11 U.S.C. and 28 U.S.C.).

14

commonplace under the bankruptcy court's traditional contempt procedures." *Id.*

Given this history of the contempt remedy, Congress's demonstrated ability to clearly authorize emotional-distress damages, and Congress's waiver of sovereign immunity under the statute, the *Harchar* court held that emotional-distress damages were not available under § 362(k)(1). *Id.* at 732. In so doing, the court acknowledged Congress intended, at least in part, that the automatic stay protect against psychological harm. *Id.* at 731. But, the court reasoned, § 362(k)(1)'s provisions authorizing punitive damages and attorneys' fees would "effectively address[ ]" Congress's concerns about emotional harm and that "it was incumbent upon Congress" to "explicit[ly] reference . . . 'emotional pain' or 'mental anguish'" if it intended to authorize emotional-distress damages as compensatory damages. *Id.* at 732.

**2.**

In *Aiello*, the Seventh Circuit was skeptical of a bankruptcy court's ability to award emotional-distress damages, but it left open the possibility that such damages might be available under § 362(k)(1). The court noted that the automatic stay is a recent codification of the more-than-a-century-old power of courts to stay collection efforts—a power that originated long before "the courts [grew] more confident of their ability to sift and value claims of emotional distress." *Aiello*, 239 F.3d at 880. According to that court, the automatic stay's protection "is financial in character; it is not protection of peace of mind." *Id.* at 879. The court further reasoned, "There is no indication that Congress meant to change the fundamental character of bankruptcy remedies by enacting [§ 362(k)(1)]." *Id.* at 881. And, the court noted, nothing prohibits a debtor from bringing a suit under state tort

15

law for emotional injury. *See id.* at 880. The court therefore concluded that "[t]he office of [§ 362(k)(1)] is not to redress tort violations but to protect the rights conferred by the automatic stay." *Id.*

Nevertheless, the Seventh Circuit theorized that considerations of judicial economy "might" permit an award for emotional distress under § 362(k)(1) where the plaintiff is already seeking damages for financial injury. *Id.* Noting that no such financial injury was alleged in the case before it, the court held that the plaintiff in *Aiello* was not entitled to emotional-distress damages for the defendant's willful violation of the automatic stay. *Id.*

16

**3.**

The Ninth Circuit came to yet a different conclusion in *Dawson*. There, the court concluded that "pecuniary loss is *not* required in order to claim emotional distress damages" under the statute. *Dawson*, 390 F.3d at 1149 (emphasis added). In coming to this conclusion, the court found it necessary to turn to the legislative history behind the automatic-stay provision. *See id.* at 1146–48. Quoting extensively from the House Report for the Bankruptcy Reform Act of 1978, the court emphasized that Congress enacted the automatic stay not only to provide creditors financial protection, but also to provide "the debtor a *breathing spell* from his creditors. It stops all collection efforts, *all harassment*, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or *simply to be relieved of the financial pressures* that drove him into bankruptcy." *Id.* at 1147 (emphasis added) (quoting H.R. Rep. No. 95-595, at 340 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6296–97); *see also Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1074 (3d Cir. 1992) (quoting the same language).

The Ninth Circuit further noted Congress's concern with creditor collection tactics, which can "take[ ] the form of abusive phone calls at all hours, including at work, threats of court action, attacks on the debtor's reputation, and so on. The automatic stay at the commencement of the case takes the pressure off the debtor." *Dawson*, 390 F.3d at 1147–48 (quoting H.R. Rep. No. 95-595, at 125–26). Accordingly, the court reasoned:

17

> Reading the legislative history as a whole, we are convinced that Congress was concerned not only with financial loss, but also—at least in part—with the emotional and psychological toll that a violation of a stay can exact from an . . . individual. Because Congress meant for the automatic stay to protect more than financial interests, it makes sense to conclude that harm done to those non-financial interests by a violation are cognizable as "actual damages." We conclude, then, that the "actual damages" that may be recovered by an individual who is injured by a willful violation of the automatic stay include damages for emotional distress.

*Id.* at 1148 (citation and footnote omitted).

**4.**

We find *Dawson* to be the better approach. As the *Harchar* court noted, § 362(k)(1) "is indisputably an ambiguous statute with a dearth of legislative history." 331 B.R. at 732. The best way to resolve this dilemma is not to make inferences from the doubts surrounding the general authority of bankruptcy courts in 1984, *see id.* at 730, but rather to look to the specific interests that Congress intended to protect when it enacted the automatic-stay provision just a few years earlier, *see Dawson*, 390 F.3d at 1146–48. We conclude, like the *Dawson* and *Harchar* courts, that Congress intended the automatic stay to protect both financial and non-financial interests. And, with those interests in mind, we join a growing number of circuits by expressly concluding that "actual damages" under § 362(k)(1) include damages for emotional distress resulting from a willful violation of the

18

automatic stay.[8]  *See Dawson*, 390 F.3d at 1148; *Lodge*, 750 F.3d at 1271; *Fleet Mortg.*, 196 F.3d at 269.

_____

[8] The Supreme Court's decision in *FAA v. Cooper*, 566 U.S. 284 (2012), does not compel a different result.  In *Cooper,* a divided Court concluded that the term "actual damages" in the Privacy Act ("the Act") did not authorize recovery for emotional distress from the federal government. *Id.* at 287.  Although the Court recognized that the Act protected non-financial interests, *id.* at 294–95, the Court noted indications that Congress refused to authorize emotional-distress damages, *see id.* at 295–99.  The Court first noted that the Act's remedial scheme "parallels" specific common law remedial schemes.  *Id.* at 295–96 (citation omitted).  Under those common law schemes, the term "general damages" would have clearly authorized recovery for emotional distress.  *Id.*  The Court then noted that a commission created by Congress specifically recommended that the Act allow for general damages, but that Congress never acted on this recommendation.  *Id.* at 297.  Thus, because Congress could have more clearly authorized recovery for emotional-distress damages and because the Act provided for damages against federal agencies, the Court invoked the sovereign immunity canon of statutory construction to limit damages to economic loss.  *Id.* at 299.  The sovereign immunity canon requires that ambiguous statutory language be construed in favor of immunity.  *Id.*

Unlike *Cooper*, we are unaware of any legislative history indicating that Congress refused to authorize emotional-distress damages for stay violations.  If anything, the legislative history is to the contrary.  *See supra* Parts

19

Of course, we acknowledge that the legislative history for the automatic stay, enacted in 1978, does not directly address § 362(k)(1), which was enacted in 1984. Nonetheless, the automatic stay's legislative history remains instructive: If the automatic stay was meant to protect against non-pecuniary emotional harm, it is only logical that Congress would intend to include damages resulting from that harm when it introduced the award of "actual damages" as the enforcement mechanism six years later. For the same reason, we disagree with the *Harchar* and *Aiello* courts that there is no indication Congress intended to break from past bankruptcy practice. By seeking to protect against non-pecuniary emotional harm with the automatic stay and by enacting the "actual damages" enforcement provision soon thereafter, Congress sufficiently indicated a departure from any prior practice that may have neglected emotional harms resulting from stay violations. *See Hamilton v. Lanning*, 560 U.S. 505, 516 (2010) ("[W]e 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.'" (quoting *Travelers Cas. & Surety Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 454 (2007))). Further, while the *Harchar* court concluded that Congress's concerns about non-pecuniary harms would be "effectively addressed" through the provision for punitive damages and attorneys' fees, *see* 331 B.R. at 732,

---

III.A.3 and 4; *see also Dawson*, 390 F.3d at 1147–48. Further, the defendant in the present case is neither the federal government nor a state government. We therefore leave for another case the question of whether emotional-distress damages may be recovered under § 362(k)(1) against federal or state governments.

20

we see no reason to infer that Congress intended to distinguish between the pecuniary and non-pecuniary injuries when it adopted a system of compensatory damages as a means of enforcing stay violations.

Finally, we need not and do not decide whether financial injury is a necessary predicate to recovery for emotional distress under the statute. Unlike the plaintiff in *Aiello*, the Lansaws incurred financial injury in the form of attorneys' fees when they sought to enjoin further violations of the stay by Zokaites. *See Aiello*, 239 F.3d at 880; *see also* 11 U.S.C. § 362(k)(1) ("[A]n individual injured by any willful violation of a stay . . . shall recover actual damages, *including* costs and attorneys' fees . . . ." (emphasis added)).[9]

**B.**

---

[9] Although we do not decide whether financial injury is a necessary predicate, we note that § 362(k)(1) might be the only avenue available for a debtor to recover for emotional harm resulting from a stay violation. The *Aiello* court implied that those who suffer emotional-distress damages are free to bring state tort claims, *see* 239 F.3d at 880, but multiple circuits have held that state law claims derived from a stay violation are preempted by federal bankruptcy law, *see, e.g.*, *E. Equip. & Serv. Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117, 121 (2d Cir. 2001) (per curiam); *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425–26 (6th Cir. 2000). Thus, if financial injury is later determined to be a prerequisite to emotional-distress damages under § 362(k)(1), those who suffer only emotional injuries might be, contrary to the suggestion in *Aiello*, "orphans of the law." *See* 239 F.3d at 880.

21

Having determined that § 362(k)(1) authorizes the award of emotional-distress damages, we consider what evidence is required to support such an award. Zokaites argues that the Lansaws should have been required to provide medical documentation or expert medical testimony to support their claims of emotional distress. According to Zokaites, this medical evidence was necessary to corroborate the Lansaws' testimony that they experienced emotional distress and that this distress was in fact caused by Zokaites's stay violations. Zokaites further argues that, given the lack of this evidence, the Bankruptcy Court's award was too speculative.

Depending on the circumstances of each individual case, corroborating medical evidence may be required to prove emotional harm and causation. But we decline to adopt a bright-line rule requiring such evidence to prove emotional-distress damages under § 362(k)(1). As we have concluded in the context of other federal statutes, "we see no reason to require that a specific type of evidence be introduced to demonstrate injury in the form of emotional distress." *Bolden v. Se. Pa. Transp. Auth.*, 21 F.3d 29, 36 (3d Cir. 1994) (considering the evidence required to prove emotional distress in § 1983 cases); *see also Cortez v. Trans Union, LLC*, 617 F.3d 688, 720 (3d Cir. 2010) (declining, in the context of the Fair Credit Reporting Act, to adopt a "standard requiring 'a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award [for emotional distress]'" (quoting *Cousin v. Trans Union Corp.*, 246 F.3d 359, 371 (5th Cir. 2001))). And we agree with the Bankruptcy Court that, at least where a stay violation is patently egregious, a claimant's credible testimony alone can be sufficient to support an award of emotional-distress damages. *See Dawson*, 390 F.3d at 1150.

22

"We are confident that courts . . . can ensure that plaintiffs recover only for actual injury even in the absence of expert medical testimony in such cases." *Bolden*, 21 F.3d at 36.

We conclude, moreover, that the Lansaws presented sufficient evidence of emotional distress to support the Bankruptcy Court's award. Testimony at trial demonstrated that Zokaites willfully and egregiously violated the automatic stay. On one occasion, Zokaites arrived at the Lansaws' business—a daycare—during business hours and, after he was initially denied entry, entered the daycare, backed Mrs. Lansaw against the wall, and asked her three times whether she wanted to hit him. On another occasion, Zokaites chained the doors to the daycare (albeit on a weekend) and refused to unchain the doors unless the Lansaws reaffirmed their lease with Zokaites. And, on yet another occasion, Zokaites attempted to have the Lansaws' lease with their new landlord terminated.

In short, Zokaites did not violate the stay with a mere collections call; rather, he repeatedly—at times, physically and in the presence of children entrusted to the Lansaws' care—attempted to intimidate the Lansaws. The Bankruptcy Court found the Lansaws' testimony on these incidents credible and dismissed Zokaites's testimony as "attempting to downplay or mitigate the seriousness of his misconduct." *Lansaw II*, 2015 WL 224093, at *15. We cannot, as a result, say that the Bankruptcy Court clearly erred in finding that Zokaites's violations were so egregious "that a reasonable person in the position of the [Lansaws] would be expected to suffer some psychological harm as a result of what happened." *Id.* at *9.

Neither can we say that the Bankruptcy Court clearly erred in finding Zokaites's stay violations did in fact cause emotional harm. Zokaites lists numerous stressors—*e.g.*, a

23

carbon monoxide poisoning incident, legal problems with a child, Zokaites's pre-automatic-stay conduct, and the inherent stress of bankruptcy—that may have caused the Lansaws' emotional distress. He argues that, absent extrinsic evidence linking the stay violations to the Lansaws' emotional distress, the Bankruptcy Court could not make a determination that his stay violations, rather than the non-actionable stressors, caused the distress. Emotional distress, however, need not be so thinly sliced. Mrs. Lansaw was not required, as a matter of causation, to establish with absolute precision what degree her depression was caused by the stay violations. As the Bankruptcy Court acknowledged, numerous stressors contributed to the Lansaws' emotional distress and linking the stay violations to specific manifestations of that distress was likely impossible. It is sufficient that Zokaites's stay violations were so egregious that a reasonable person could be expected to suffer some emotional harm and that the Lansaws credibly testified that the violations did cause such harm.

Of course, as a matter of damages, plaintiffs like the Lansaws will be more successful when they can link the stay violations to the entirety of their distress. In the present case, for example, the Bankruptcy Court found it necessary to "discount" the emotional damages award so that the Lansaws were not compensated for non-actionable distress. *Lansaw II*, 2015 WL 224093, at *15. The Bankruptcy Court looked to emotional-distress awards in analogous cases, *see, e.g.*, *Snowden v. Check Into Cash of Wash. Inc. (In re Snowden)*, 769 F.3d 651, 655 (9th Cir. 2014), and awarded the Lansaws a comparably modest $7,500. Zokaites argues that this approach was unduly speculative. But, considering the circumstances of this case and the variety of stressors contributing to the Lansaws' distress, we cannot say the

24

approach was clearly erroneous. *Cf. Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1203 (3d Cir. 1986) (Higginbotham, J., concurring in result) ("[T]here is 'no legal yardstick by which to measure accurately reasonable compensation' for injuries such as emotional distress." (citation omitted)).

In sum, plaintiffs claiming emotional-distress damages under § 362(k)(1) must demonstrate, as required by the statute, that they suffered "actual" emotional harm caused by the willful stay violation. The evidence necessary to demonstrate such harm will likely vary from case to case. But, at least where the evidence also shows that the stay violations were patently egregious, a plaintiff's credible testimony that the violations did in fact cause emotional distress is sufficient to support an award of damages. Here, we conclude that the Lansaws presented such evidence and that the Bankruptcy Court did not clearly err in crediting the Lansaws' testimony. Under the circumstances of this case, an award of $7,500 for emotional distress was neither unreasonable nor unduly speculative.

## IV.

Zokaites next argues that the Bankruptcy Court erred in awarding the Lansaws punitive damages. As previously noted, § 362(k)(1) allows for punitive damages "in appropriate circumstances." Although such an award must "comport[ ] with due process," *CGB Occupational Therapy*, 499 F.3d at 188, punitive damages are largely left to the discretion of the bankruptcy court, *see Solfanelli v. Corestates Bank N.A.*, 203 F.3d 197, 203 (3d Cir. 2000).

We conclude, first, that punitive damages were appropriate in the present case. Zokaites correctly states that one of the purposes behind punitive damages is to deter future misconduct. *See State Farm Mut. Auto. Ins. Co. v. Campbell*,

538 U.S. 408, 416 (2003). He further asserts that, because he has not improperly contacted the Lansaws in the years since the stay violations, "there [is] simply no evidence of future bad conduct to deter." Appellant's Br. 49. But, given the nature of Zokaites's stay violations and his attempts to downplay the violations at trial, we cannot say the Bankruptcy Court erred in determining punitive damages were appropriate under the circumstances. We reach this result even though the Bankruptcy Court considered evidence from the 2006 trial concerning Zokaites's ability to pay punitive damages. As the Bankruptcy Court noted, other evidence from the 2014 trial (*e.g.*, Zokaites's multiple residences) indicated he was still financially capable of paying punitive damages.

Turning to the punitive damages award itself, we conclude $40,000 comports with due process. In so doing, we "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases." *CGB Occupational Therapy*, 499 F.3d at 189 (quoting *State Farm*, 538 U.S. at 418). Zokaites's repeated stay violations, already discussed at length, were sufficiently reprehensible to support the award. *See id.* at 190 (discussing the factors considered in determining degree of reprehensibility). Indeed, Judge Agresti carefully reviewed Zokaites's conduct and concluded that the behavior was the "most egregious" he had ever encountered in his time on the bench. *Lansaw II*, 2015 WL 224093, at *20. The 4-to-1 ratio between the punitive damages award and the actual damages award ($10,100, including $7,500 for emotional distress and $2,600

26

in attorneys' fees) is in line with awards previously deemed acceptable by the Supreme Court. *See State Farm*, 538 U.S. at 425. And, although $40,000 is higher than other awards examined by the Bankruptcy Court, *see, e.g.*, *In re B. Cohen & Sons Caterers, Inc.*, 108 B.R. 482, 487–88 (E.D. Pa. 1989), we conclude that, under the circumstances of this case, the award is not sufficiently excessive to be unconstitutional.

## V.

Because we conclude § 362(k)(1) authorizes recovery for emotional distress, the Lansaws presented sufficient evidence to support such an award, and punitive damages were properly assessed, we will affirm.[10]

---

[10] Zokaites also argues that the damages awards are property of the bankruptcy estate. After reviewing the record, however, we conclude that this argument has been waived. In his post-trial brief before the Bankruptcy Court, Zokaites argued the awards should be offset against his claims in the main bankruptcy case, but he did not argue that the awards are property of the estate.